**UNITED STATES of America,**
**Appellee,**

v.

**Arvinder SINGH, Defendant–Appellant,**

**Rosanna Cerone and Toni**
**Coons, Defendants.**

**No. 03–1546.**

United States Court of Appeals,
Second Circuit.

Argued: May 21, 2004.

Decided: Nov. 23, 2004.

John L. Pollok, Hoffman & Pollok LLP, New York, N.Y. (Susan C. Wolfe and William A. Rome, on the brief) for Defendant–Appellant.

David M. Grable, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney, on the brief; Assistant United States Attorney Steven D. Clymer, Special Litigation Counsel Robert P. Storch, of counsel), for Appellee.

Before: MINER and POOLER, Circuit Judges, and GOLDBERG, Judge.*

MINER, Circuit Judge.

Defendant-appellant Arvinder Singh appeals from a judgment of conviction and sentence entered in the United States District Court for the Northern District of New York (Scullin, C.J.), following a jury trial. Singh was convicted of health care fraud, in violation of 18 U.S.C. § 1347; conspiracy to distribute and dispense controlled substances, in violation of 21 U.S.C. § 846; and causing and aiding and abetting the illegal distribution and dispensation of controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. His sentence included a term of imprisonment of forty-six months, an order to pay restitution in the sum of $227,127.82, and forfeiture of his medical license.

The judgment against Singh arises from the activities of the medical practice he conducted under the name of Diagnostic Interventional Pain Management & Rehabilitation Services, Inc. ("the Practice"). In this appeal, Singh challenges the denial of his motion to suppress evidence, the sufficiency of the evidence against him, certain jury instructions, and various aspects of his sentence.

## BACKGROUND

### A. *Structure of the Practice*

Singh was a physician, licensed by the State of New York, who owned and operated the Practice during the 1996–1999 time period relevant to this appeal. The Practice was located on the first floor of Albany Memorial Hospital ("the Hospital") and specialized in the management of chronic pain. Although the Practice was head-

quartered at a suite in the Hospital, Singh spent a great deal of time elsewhere. He regularly traveled to Port Chester, New York and to Saratoga, New York to treat patients at those locations. He often was absent from the suite to treat patients at a pain clinic on the fourth floor of the Hospital and to perform surgery in the Hospital operating room. Singh also absented himself from time to time on vacations to distant places.

During portions of the relevant time period, Singh employed two other physicians in the Practice. Dr. Edward Apicella was employed between July 1995 and November 1997, and Dr. Abraham Rivera was first employed in February 1998. During the November 1997–February 1998 period, there was no second physician in the Practice. Like Dr. Singh, Doctors Apicella and Rivera frequently were absent from the suite, performing surgeries and procedures at the Hospital and traveling to Kingston, New York; Troy, New York; and other New York State locations to treat patients.

Singh also employed a number of non-physician medical personnel in the Practice. During part or all of the relevant time period, Margaret Peruzzi, Pamela Madej, and co-defendant Rosanna Cerone worked as nurses, and Robin Sacks worked as a physician's assistant, in the Practice suite. Madej became licensed as a nurse practitioner in June 1998. The clerical staff employed by the Practice included billing clerks, such as co-defendant Toni Coons, who generated claims forms that were submitted to various health care benefit programs for reimbursement of fees for services rendered by the Practice.

---

* The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

### B. *Drug Prescriptions at the Practice*

The nature of the Practice, i.e. pain management, required that many of the patients have new prescriptions for Schedule II Controlled Substances on a regular basis. Nurses are not authorized by law to write these prescriptions, which must be written in triplicate by licensed physicians only. Singh developed a scheme that enabled nurses to see patients alone, to issue prescriptions for Schedule II Controlled Substances, and to bill for such services. He and the other physicians would pre-sign the triplicate forms and provide them to non-physician personnel to use during patient visits. These employees, although not trained or legally authorized to do so, filled in all the required prescription information—drug type, dosage, and quantity—and provided the prescriptions to the patients.

It appears that the physicians at the Practice, including Singh, signed entire books of triplicate prescription forms in blank without even knowing the identities of the patients to whom the prescriptions would be issued or the nature or dosage of the drug to be prescribed. Even when a physician was present in the suite, a nurse would fill in the prescription forms without any involvement on the part of the physician. Dr. Apicella testified that Singh instructed him to sign the triplicate form books so nurses would not bother Apicella when they saw patients. Indeed, Singh urged Nurse Cerone not to consult him before filling in the prescription forms, and she testified that she stopped talking to Singh about prescriptions after he told her: "[Y]ou know what to do so just do it."

Data extracted from Singh's office records revealed that the nurses issued prescriptions for at least 76,000 tablets of Schedule II Controlled Substances when Singh was not present in the Practice suite. When Nurse Madej obtained her nurse practitioner's license in June of 1998, enabling her to begin prescribing Schedule II drugs, Singh told her she could then "really" do what she had been doing all along. Before that time, Singh had instructed her to keep the signed triplicate forms on her person and out of the sight of the patients. He also told nurse Peruzzi not to let patients see her use the pre-signed forms.

### C. *Billing Methods at the Practice*

From at least June 1996 until at least July 1999, the nurses employed by Singh routinely saw established patients at the Practice during follow-up office visits and did so without a physician present. The visits typically involved patients returning to obtain new prescriptions or new supplies of medication. During these follow-up visits, the nurses evaluated the medical conditions of the patients based on information that the patients had provided orally and on written forms called "body sheets." On a typical visit, the patient sat across a desk from the nurse and discussed his or her physical condition. The nurses did not take vital signs or otherwise perform physical examinations during the visits.

Singh apparently expected his nurses to treat patients alone and without supervision by a physician. The nurses had their own daily schedule of patients' appointments, both on days when there was, and on days there was not, a doctor in the suite. An internal office policy memo directed that nurses be scheduled to see fifteen patients on days when Singh was not in the suite. Singh also directed his billing personnel periodically to generate "productivity reports," which listed various dollar amounts of claims for reimbursements that nurses and doctors had generated through office visits during given time periods. Singh also generated "score-

cards" that he used to keep track of the number of patients that the nurses and doctors were seeing on a weekly basis.

Singh's scheme involved the submission of false claims for reimbursement for the nurses' visits. After a nurse had seen a patient at the Practice, she would complete a "superbill." The standard superbill was a preprinted form that permitted medical personnel to check off various standard codes to designate the medical services that purportedly had been rendered. The codes on the superbill were based on the American Medical Association ("AMA") Physician's Current Procedure Terminology ("CPT") Guidebook and are known as "CPT codes" or "procedure codes." After the nurses had completed the superbills, billing clerks at the Practice used the information on the bills, and specifically the CPT code indicated, to generate claim forms. These forms were submitted to health care benefit programs for reimbursement for the office visits.

The particular CPT codes relevant to Singh's scheme were codes 99211 through 99215, a series that covers a physician's "evaluation and management" of an established patient during an office visit. Determination of the proper CPT code among those five depends on the complexity of the physician's decision-making, the comprehensiveness of both the physical examination and the patient history, the severity of the presenting medical problem, and the amount of face-to-face time that the physician spends with the patient and the patient's family.

When a nurse treats a patient without a doctor's involvement on a particular visit, the only CPT code that a medical practice may appropriately submit for reimbursement is 99211, and then only if the nurse provides the service under a physician's supervision. The definitions of the codes themselves, as set forth in the CPT Guidebook (a copy of which Singh kept in his own billing office), state that 99211 is the only code that "may not require the presence of a [physician]." The Guidebook sets forth various examples of face-to-face time that physicians typically spend with patients to justify billing codes 99212 through 99215. Moreover, an AMA manual specifically geared toward pain management practices, which was also found in Singh's billing office, highlighted the "may not require the presence of a [physician]" language of code 99211, and instructed that 99211 was the appropriate code to bill where "a patient comes in to discuss medication dosage or some other matter relating to his/her condition [and] a nurse provides the service."

Furthermore, the Practice's standard superbill—which clinicians, including the nurses and Singh, used to notify the billing office as to which CPT code should be billed for a particular visit—stated next to the 99211 entry in the 99211–99215 series that the 99211 code "[m]ay not require Presence of MD." Computerized productivity reports generated at Singh's direction included the words "[m]ay not require presence of MD" to describe only code 99211. Moreover, when Madej did dictation for her own visits, Singh told her to suggest that he had been involved in the visits so that he would be able to be reimbursed for her office visits. Consequently, the Practice routinely submitted claims to health care benefit programs for CPT codes 99212 through 99215 even when nurses saw patients without face-to-face physician involvement. Data obtained from Singh's computer database showed that he billed the vast majority of nursing visits under CPT codes 99214 or 99215, the highest codes in the series.[1] The same data

---

1. For example, the average charge for CPT code 99211 was $25, compared to the average charge of $97.13 for CPT code 99215.

showed that, during the 1996–1999 time period, Singh submitted $459,670.89 worth of claims for reimbursement for nursing visits billed under codes 99212 through 99215.

As part of the process of generating claims to health care benefit programs, billing clerks at the Practice had to collect completed superbills and enter into the Practice's computer system the CPT code that the medical staff member had marked on the superbill. The computer system would later be used to print out the claim forms. Although that process involved the simple mechanical input of CPT codes from the superbill, co-defendant Coons often "upcoded," or increased, the level of the CPT codes. Of the superbills that Coons had entered into the computer system and that the Government was able to locate, she had upcoded ninety-two and down-coded seven, a thirteen-to-one ratio. This was a clear indication that the upcoding was not the result of inadvertent error.

### D. Search of Singh's Office and Home

On July 22, 1999, Magistrate Judge Smith issued a warrant upon application of the Government, authorizing the search of the Practice suite and of Singh's home in Loudonville, New York. The next day, Magistrate Judge Yanthis issued a warrant authorizing the search of Singh's office in Port Chester. On July 27, 1999, the Government submitted an amended application, affidavit, and search warrant to Magistrate Judge Sharpe. These papers included supplemental language related to the seizure of computers and computer-stored data at Singh's Albany office and home, which Magistrate Judge Sharpe authorized, although he stated that he would not have issued the warrant to search Singh's house based on the information originally submitted to Magistrate Judge

Smith. On July 27, 1999, federal agents and investigators from the Office of the Inspector General, United States Health and Human Services ("HHS"), the FBI, and the DEA executed search warrants at Singh's offices in Albany and Port Chester and at his home. Among the items they found were presigned triplicate prescription forms and detailed computerized records reflecting the income generated by nurses' billing for CPT codes, including codes 99212 through 99215, as well as various patient charts evidencing nurse-only office visits.

### E. Indictment, Pretrial Motion to Suppress, and Guilty Pleas by Co-defendants

In September 2001, a federal grand jury returned a sixty-five-count superseding indictment charging Singh with forty counts of health care fraud, in violation of 18 U.S.C. § 1347; one count of conspiracy to distribute and dispense controlled substances, in violation of 21 U.S.C. § 846; and twenty-four counts of causing and aiding and abetting the illegal distribution and dispensation of controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The indictment also sought the forfeiture of Singh's New York medical license because he had used it while committing or facilitating the commission of the felony controlled substance offenses alleged in the indictment. Cerone and Coons were also named as defendants in several counts in the indictment.

Prior to trial, Singh moved to suppress the items seized during the execution of the search warrants, and for a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), both of which were denied. Prior to trial, Cerone pled guilty to participating in the

fraud scheme involving the coding of office visits to reflect that a patient had seen a nurse under a doctor's supervision and to the drug conspiracy charge. She testified at trial as a cooperating witness. Coons, too, pled guilty to participating in the "up-coding" fraud scheme, but did not testify at trial.

### F. *Trial and Sentencing*

Singh's trial lasted two-and-a-half weeks, during which the Government presented testimony from several former and current employees and patients of Singh. Singh also testified on his own behalf, claiming that the crimes alleged in the indictment were committed without his knowledge or as a result of his mistaken interpretation of the billing codes. The jury convicted Singh on sixteen of the health care fraud counts and all of the other counts. All the health care fraud counts on which Singh was convicted related to dates when no Practice physicians were present in the Practice suite or in the Hospital in which it was located. After receiving a significant downward departure (from level 42 to level 23) because his drug conviction was outside the heartland, Singh was sentenced to forty-six months' imprisonment (to be followed by three years of supervised release). He was also ordered to pay restitution in the stipulated amount of $227,127.82 and to forfeit his New York medical license. This timely appeal followed.

By stipulation of the parties, the forfeiture issue was decided by the trial court, rather than the jury, and the Court issued an order dated May 20, 2003 directing the entry of a judgment of forfeiture. A post-trial motion for a judgment of acquittal on the drug counts, pursuant to Fed. R.Crim.P. 29, or, in the alternative, for a new trial on the fraud and drug counts, pursuant to Fed R.Crim. P. 33, was denied by the district court in a Memorandum-Decision and Order dated June 19, 2003.

## DISCUSSION

### I. *Search and Seizure*

While many of the patient records introduced at trial were seized from the Practice offices, a number of documents received in evidence were seized from Singh's residence. The documents seized included productivity reports and documents relating to Singh's travels. Singh claims on appeal that the warrant application included stale information, that information furnished by one informant was unreliable and uncorroborated, and that there was an insufficient nexus between Singh's residence and criminal activity. Singh also contends that a *Franks* hearing was wrongfully denied.

The affidavit in support of the search warrants was furnished by Special Agent Gerardi of the Office of the Inspector General, HHS, on July 22, 1999. The affidavit included first-hand accounts provided to the affiant by people who had been employed by Singh, as corroborated by the independent review of records then available. The affidavit recited information received by HHS that Singh had been allowing his staff nurses to examine patients and issue prescriptions of controlled substances. It also recited a December 1997 interview of Nurse Cerone by investigators from the New York State Medicaid Fraud Control Unit and the New York State Department of Health. Cerone admitted that she had seen patients and conducted hospital rounds when Singh was absent, and that, at Singh's direction, she had had the office submit claims for "high complexity" visits after seeing patients alone. The affidavit also indicated that Cerone had shown investigators blank prescription forms of the type that Singh had provided for her to complete and issue to patients in

a manner that would make it appear that he had been present when the prescriptions were issued.

The affidavit next described information obtained in interviews on July 31, 1998, October 1, 1998, and April 30, 1999 with Bruce Storm, who was Office Manager for the Practice from June through October, 1997. Storm provided information about the structure of the Practice, the locations of Singh's activities in Albany and other cities, and the names of the nurses who saw patients. He stated that, when Singh was away from Albany, nurses saw patients without physician involvement, and that nurses also saw patients without direct supervision even when Singh was in the office. Storm was aware that Singh left pre-signed, blank prescription pads before traveling from one office to another and was aware that nurses would write the prescriptions for patients. Storm also described how Singh upcoded his claims to insurance companies for reimbursement.

With respect to the billing process, Storm stated that Singh's wife, Jesleen Singh, came to the Practice office three to four days each week and was involved in every aspect of the business of the Practice. In his final interview, Storm revealed that Jesleen Singh worked on the business payables and payroll of the Practice at the Singh residence.

According to the affidavit, Dr. Apicella, who worked in the practice from July, 1995 to November, 1997, corroborated Storm's account of the use of pre-signed prescription forms. Corroboration also came in the form of(i) a state investigator's report of an interview with one of Singh's patients and (ii) Special Agent Gerardi's review of the reimbursement claims submitted to Medicare for that patient. These items revealed that, after that patient's initial visit, she was seen alone by Nurse Cerone, although the Practice routinely represented, for the purpose of reimbursement, that a physician had performed complex evaluation and management services for the patient.

The affidavit also recounted a July 8, 1998 interview with the Chief Operating Officer of the United Hospital Medical Center in Port Chester. Information provided by this source about Singh's schedule at the medical center, compared with the data collected from the Practice office in Albany, demonstrated that the Practice was routinely submitting claims for expensive and complex procedures requiring Singh's presence in Albany on dates when he actually was in Port Chester. Further support for the warrants, insofar as they sought information related to health care fraud, was found in the Special Agent's analysis of computer printouts of Singh's submission of claims from January, 1996 through January, 1999. These forms revealed a "dramatic disparity" between the large number of expensive, high-complexity claims and the low volume of less complex claims that called for lower reimbursement rates. The Special Agent found that this disparity "strongly" suggested both upcoding and fraudulent submission of codes.

Supporting probable cause for a search in regard to the distribution of controlled substances, the affidavit contained the analysis of a Drug Enforcement Administration Investigator who had collected records of prescriptions filled at local pharmacies for Schedule II Controlled Substances issued to patients of the Practice. This review led the Investigator to conclude that the controlled substances were prescribed in quantities far exceeding those recommended by the Physicians Desk Reference; that these quantities were not reduced over time as is common in pain management; and that the prescription of multiple drugs with different brand names

at the Practice had the effect of disguising the total quantities prescribed.

After identifying the documents to be searched for and seized, Special Agent Gerardi noted that, in her nine years of experience in working on health care fraud and drug-distribution cases, she found that it was common that such records and related documents were kept for long periods of time, well over several years. She also found that people frequently maintained financial and bank records at their homes or businesses and kept such records for a number of years. Based on the foregoing, three Magistrate Judges approve the issuance of the search warrants.

■ Several general principles govern our review of Singh's claim that the searches of his offices and residence violated the Fourth Amendment. In reviewing a magistrate's probable cause determination, we accord substantial deference to the magistrate's finding and limit our review "to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner,* 989 F.2d 69, 72 (2d Cir.1993).

■ If a defendant claims that the Government agent who obtained the search warrant submitted an affidavit containing information that the agent knew to be false, or submitted in reckless disregard for the truth, the district court need order a hearing only if the defendant makes an offer of proof suggesting knowing falsity or reckless disregard (as opposed to negligence), and if, setting the suspect information aside, there is no longer probable cause to support the search. *See Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

■ Finally, even if the affidavits submitted in support of the search warrant did not evince probable cause, the court may admit seized evidence unless: (1) the issuing magistrate relied on an affidavit that the affiant knew was false or would have known was false had he or she not acted in "reckless disregard of the truth"; (2) the "magistrate wholly abandoned his judicial role"; (3) the "affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (internal quotation marks omitted).

■ Singh contends that the only relevant allegations in the search warrant application that supported a finding of probable cause for a search of Singh's residence were stale and came from a biased informant—Bruce Storm. While Storm oversaw the office and billing staff at the Practice only during the five-month period from June through October, 1997, he described in detail the procedures that were followed during that time, including the extensive paperwork prepared for the Practice by Jesleen Singh at the Singh residence.

■ While a period of more than twenty months elapsed between Storm's last date of employment in the Practice and the search warrant application, "when the supporting facts present a picture of continuing conduct or an ongoing activity, . . . the passage of time between the last described act and the presentation of evidence becomes less significant.'" *United States v. Ortiz,* 143 F.3d 728, 732–33 (2d Cir.1998) (quoting *United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981)). Moreover, the passage of time is not controlling and is but one factor to be considered, along with the kind of property sought and the nature of the criminal activity, in resolving the issue of probable cause for a search

warrant. *See United States v. Foster,* 711 F.2d 871, 878 (9th Cir.1983). The length of the criminal activity is another factor that is given consideration. *See United States v. Farmer,* 370 F.3d 435, 439 (4th Cir.2004).

The information provided by Storm relating to the operation of the Practice indicated an activity of an ongoing and long-term nature, and the passage of time between the furnishing of the information and the execution of the warrant was not significant under the circumstances. The records sought at Singh's home and described by Storm constituted evidence of the ongoing health care fraud scheme. Storm explained the part played by Ms. Singh in the business of the practice and provided the necessary information that Ms. Singh maintained billing and accounts payable records at the Singh home. Her activity at the residence was of a continuous and protracted nature, *see United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972), and the staleness claim must be rejected. The affidavit established probable cause to believe that Singh continued to maintain business records evidencing fraud at his residence during the more than twenty months that elapsed between the last known occurrence of the facts relied on and the issuance of the warrant. *See United States v. Rahn,* 511 F.2d 290, 292–93 (10th Cir.1975) (lapse of eighteen months).

The information provided by Storm also established a sufficient nexus between the criminal activities alleged and Singh's residence. A showing of nexus does not require direct evidence and "may be based on 'reasonable inference' from the facts presented based on common sense and experience." *United States v. Buck,* 1986 WL 12533, at *4 (S.D.N.Y. Oct.24, 1986) (quoting *United States v. Santarsiero,* 566 F.Supp. 536, 539–40

(S.D.N.Y.1983)), *rev'd on other grounds,* 813 F.2d 588 (2d Cir.1987). In addition to the information from Storm supporting a nexus, Special Agent Gerardi, an experienced case agent, opined not only that the materials sought were of the type that would be kept over a period of years but that they could reasonably be found in a residence. Singh's claim that Storm's information was unreliable and uncorroborated also is rejected. The fact that Storm was fired from his position in the Practice did not render his information unreliable per se, and the information he provided certainly was corroborated by other employees of the Practice and by information uncovered by the state investigators.

Referring to the information provided by Nurse Cerone, Dr. Apicella, and Office Manager Storm, Singh contends that, "[s]ince all the information provided was over a year and a half old, it was stale and cannot provide adequate probable cause to search Dr. Singh's offices." As discussed above, in connection with Singh's claim of staleness regarding the search of his residence, the passage of time alone does not invalidate information provided in support of a search. Here, too, the individuals providing information were able to paint a picture of continuing illicit conduct and ongoing criminal activity in the Practice in regard to both the illegal dispensing of drugs and the health care fraud scheme. The activities of the Practice office observed by these informants continued over an extended period of time and were ongoing, and there was no indication that they would cease at any time in the future. The records made and retained in the business office were of the type that would necessarily be kept over a period of years and would reasonably be found in the business office of any medical practice.

The staleness cases relied on by Singh are distinguishable. In *United States v. Wagner,* 989 F.2d 69, 75 (2d Cir.1993), the search was invalidated on staleness grounds because the defendant charged in a one-time drug transaction had not been linked in any way to the ongoing conspiracy. In *United States v. Paul,* 692 F.Supp. 186, 192–93 (S.D.N.Y.1988), the warrant was held to be invalid to the extent it authorized a search of an apartment for cash proceeds of an extortion five months after allegations were made relating to the extortion. No challenge was made to the warrant's authorization to search the apartment for bank statements and financial records, however, and the Court found that it was "reasonable to infer [that] an individual like [the defendant]" would keep such records in his house over an extended period of time. *Id.* at 193.

■■■■ The District Court denied the suppression motion in the case at bar on the alternative ground that the warrant was executed in good faith. In certain circumstances, the good faith exception avoids the invalidation of a search conducted pursuant to a defective search warrant and the consequent exclusion of evidence gained thereby. *See Leon,* 468 U.S. at 909, 104 S.Ct. 3405. Application of this rule also justifies denial of the suppression motion here. The affidavit in support of the search warrant provided detailed information of criminal activity, as previously described, and also recited that Special Agent Gerardi had been told by an Assistant United States Attorney that he agreed that the information revealed in the affidavit established probable cause for the search. Under these circumstances, it was objectively reasonable for the Special Agent to believe that probable cause for the warrant was stated and for her and the other agents to rely in good faith on the warrant as issued by the Magistrates. *See*

*id.* at 922, 104 S.Ct. 3405. Accordingly, the District Court was correct in concluding that the good faith exception to the exclusionary rule was applicable. *See id.* On appeal, Singh seeks to avoid the application of the good faith exception because the three magistrates who approved the warrants were misled by information in the affidavit that the Special Agent knew was false. The argument is rejected for the reasons given below with respect to the denial of a *Franks* hearing.

■■■ In moving for an evidentiary hearing under *Franks,* Singh argued that Special Agent Gerardi recklessly withheld from the supporting affidavit a 1998 report by Dr. Howard Rosner, who reviewed patient records of the Practice for the New York State Department of Health, Office of Professional Medical Conduct. Files pertaining to nine patients were furnished to Dr. Rosner during the course of that review. Dr. Rosner is a physician, Associate Professor of Clinical Anesthesiology at the Weil Medical College, Cornell University, and Director of the Pain Management Service of New York Presbyterian Hospital, Cornell Campus. In his report, Dr. Rosner opined that the medications prescribed for the nine patients were medically appropriate.

For a *Franks* hearing, Singh needed to "make[ ] a substantial showing" that the Special Agent "knowingly, intentionally[,] or recklessly" excluded Dr. Rosner's report from her affidavit and that the report "was necessary to the finding of probable cause." *See United States v. Zagari,* 111 F.3d 307, 321 (2d Cir.1997). Here, the District Court properly found that "there [was] no support other than conjecture that the Special Agent involved here . . . was reckless or intentionally omitted a finding of . . . [the] report in her affidavit." This factual finding was not clearly erroneous, and is supported by the record, given

the facts that only one of the nine files reviewed by Dr. Rosner was for a patient whose file was sought in the warrant as evidence of the drug crimes; that Dr. Rosner was asked to examine drug type, whereas the affidavit focused on the excessive quantities prescribed; and that Dr. Rosner's letter indicated that his ability to answer even the narrow question before him was limited due to the poor condition of the documents he reviewed, as compared to the actual prescription records from pharmacies examined by the Drug Enforcement Administration Investigator referred to in the affidavit. The District Court properly found that the report was "not clearly critical" to the probable cause determination and properly denied a *Franks* hearing for failure to make a proper and adequate showing. *See Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991).

## II. *Jury Instructions*

■ Singh's challenge to the jury instructions is centered on the following portion of the jury instructions:

In order to prove that a person violated Title 21, United States Code, Section 841(a)(1) as set forth in those counts, 42 through 65, the substantive crime of illegally distributing or dispensing a controlled substance, the Government must prove—must establish beyond a reasonable doubt each of the following elements that make up the crime.

Three elements are, first, the drugs prescribed were [S]chedule II[C]ontrolled [S]ubstances; second, the drugs were prescribed; and third, that the person who prescribed the [S]chedule II[C]ontrolled [S]ubstances knowingly prescribed them and was not authorized to do to.

Now the first element[:][T]he parties have stipulated[ ] the drugs named in the prescriptions alleged in the indictment as set forth there all are [S]chedule II[C]ontrolled [S]ubstances. Therefore, you need not concern yourself with this element of the offense.

Second element[:] The parties do not dispute that the drugs were prescribed. Therefore, you need not concern yourself with that element.

The third element[:] The parties in this case do dispute the identity of the person or persons who prescribed the controlled substances charged in the indictment. The Government contends that nonphysicians such as nurses prescribed the [S]chedule II[C]ontrolled [S]ubstances described in the indictment and that defendant Singh caused and aided and abetted them to do so. Defendant Singh contends that he prescribed the [S]chedule II[C]ontrolled [S]ubstances described in the indictment.

Now under certain circumstances, physicians and certain other licensed health care professionals are authorized by law to prescribe controlled substances and thus can do so without committing the crime of distribution and dispensing of controlled substances as I have described. The parties have stipulated, however, that nurses are not authorized and cannot be authorized to prescribe [S]chedule II[C]ontrolled [S]ubstances.

There is no support for Singh's claim that the District Court "wrote the essential element of distributing out of the statute and the indictment" in giving the instruction quoted above. In the quoted instruction, the trial court clearly stated the elements to be established in identifying "the substantive crime of illegally distributing or dispensing a controlled substance." The court provided the jury with copies of the indictment charging

Singh, in Counts 42 through 65, with causing and aiding and abetting the illegal distribution or dispensation of Schedule II Controlled Substances. In laying out the elements of the crime, the District Court used the term "prescribed" as shorthand for both distributing and dispensing because the factual allegations revolved around the illegal use of drug prescriptions. The government contended that Singh caused and aided and abetted the illegal issuance of prescriptions by the nurses, and Singh contended that he legally prescribed the controlled substances described in the indictment. Nurses are not authorized to either dispense or distribute such substances without authorization of the type that was absent here.

 The foregoing instruction permitted the jury to find that the nurses were engaging in illegal distribution or dispensation because: (1) nurses do not fit within the category of persons authorized to "dispense" or prescribe controlled substances for ultimate users; and (2) a prescription written by a nurse constitutes a "delivery" of a controlled substance within the statutory definition of distribution. *See United States v. Flowers*, 818 F.2d 464, 467 (6th Cir.1987); *United States v. Tighe*, 551 F.2d 18, 20 (3d Cir.1977). Moreover, even were we to find that Singh was correct in asserting that, because nurses cannot "dispense," and the use of the word "prescribe" allowed the jury to find only that they were "dispensing" *rather than* "distributing," the error would not be plain. Assuming, then, that the instruction was incorrect, as Singh contends, because it would allow the jury to find only unauthorized dispensing by the nurses rather than distributing, it could not be considered plainly erroneous for the following reasons.

 Fed.R.Crim.P. 52(b) limits the review of unpreserved error as follows:

First, there must be "error," or deviation from a legal rule which has not been waived. Second, the error must be "plain," which at a minimum means "clear under current law." Third, the plain error must, as the text of Rule 52(b) indicates, "affect[ ] substantial rights," which normally requires a showing of prejudice.

*United States v. Workman*, 80 F.3d 688, 696 (2d Cir.1996) (quoting *United States v. Viola*, 35 F.3d 37, 43 (2d Cir.1994) (alteration in original)). In the first place, the error here, if any, is not clear under current law in this Circuit. In *United States v. Ekinci*, 101 F.3d 838, 841–43 (2d Cir. 1996), we held that there was a difference between "distribute" and "dispense" for the purpose of determining the question of guilt under 21 U.S.C. § 860 (prohibiting distributing, but not dispensing, controlled substances within one thousand feet of a school). We went on to note, however, that in prosecutions under Sections 841 and 846, "it may well be that there is no significant difference between dispensation and distribution." *Ekinci*, 101 F.3d at 842. In any event, there is no showing of prejudice in this case in light of the overwhelming evidence presented on behalf of the government. For the same reason, it cannot be said that the error alleged "seriously affect[ed] the fairness, integrity[,] or public reputation of judicial proceedings, *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted), as is required to establish that a plain error affected substantial rights.

 Although Singh made no objection to the instruction noted above, as required, *see* Fed.R.Crim.P. 30(d), note is taken of the argument made by Singh in his pretrial motion and at the charge conference for an instruction in accordance with *United States v. Moore*, 423 U.S. 122, 142–43,

96 S.Ct. 335, 46 L.Ed.2d 333 (1975). A *Moore* instruction would have conveyed to the jury that Singh could be convicted only "if the jury found that he knowingly distributed controlled drugs 'other than in good faith ... in the usual course of professional practice and in accordance with a standard of medical practice generally recognized and accepted in the United States.' " *United States v. Vamos,* 797 F.2d 1146, 1151 (2d Cir.1986) (quoting *Moore,* 423 U.S. at 138–39, 96 S.Ct. 335). Rejecting Singh's argument, the District Court found that Singh could be convicted without reference to the standard in *Moore* if he caused and aided and abetted the distribution or dispensation by others not authorized to do so. The District Judge did in fact accommodate the contention Singh advanced in the District Court by charging the jury as follows:

If, however you find that it was defendant Singh who prescribed the schedule II controlled substances, then you should consider whether defendant Singh did so "in the usual course of medical practice" and "for a legitimate medical purpose." In other words you must determine whether defendant Singh acted in good faith. Good faith in this context means with reasonable and good intentions and the honest exercise of best professional judgment as to a patient's needs; that is, that defendant Singh acted in accordance with what he reasonably believed to be proper medical practice. The Government bears the burden of proving the lack of good faith beyond a reasonable doubt.

■ Singh also raises for the first time on appeal the contention that the jury instructions constructively amended the indictment by allowing the jury to consider his liability as a principal. Aside from the fact that he did not object to the instructions on this ground, Singh seems to have actively sought submission of a charge addressing his liability as a principal. In any event, Singh was charged in the indictment as a principal, pursuant to 18 U.S.C. § 2, which provides in subdivision (a) for punishment as a principal of anyone who "aids, abets, counsels, commands, induces[,] or procures" the commission of an offense against the United States and in subdivision (b) for punishment as a principal of anyone who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States." The District Court gave a detailed instruction in regard to the law governing principal liability and specifically advised the jury as follows with regard to Singh:

[Y]ou may find defendant Singh guilty of the offense charged if you find beyond a reasonable doubt that the Government has proven that another person actually committed the offense with which defendant Singh is charged and that defendant Singh caused and/or aided or abetted that person in the commission of the offense.

We have observed that "18 U.S.C. § 2 does not create a separate crime. It simply makes an aider and abettor a principal, and one who aids and abets a violation of a statute has violated that statute." *United States v. Perry,* 643 F.2d 38, 45 (2d Cir. 1981). Here, the substantive drug counts in the indictment charged Singh with "willfully caus[ing] and aid[ing] and abett[ing] the nurses' illegal distribution and dispensation of controlled substances," in violation of [21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2]." A challenge of the same type made here was rejected in *United States v. Scandifia,* 390 F.2d 244 (2d Cir.1968), *vacated on other grounds sub nom. Giordano v. United States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969). There, the defendant "insist[ed] that because the indictment charged only that he 'caused' the

transportation [of counterfeit securities] he [could] [ ]not be found guilty for having transported the bonds himself." *Id.* at 250 n. 6. This Court summarily rejected this claim, stating that it "seems specious to argue that one who brings about a result directly cannot be fairly said to have caused that result." *Id.*

■ Singh is off the mark in contending that the challenged instruction allowed him to be convicted for acts other than those specified in the indictment. The indictment charged him with pre-signing the triplicate prescription forms that his nurses later used illegally to distribute and dispense specific controlled substances to individual patients. The evidence at trial described above mirrored and proved those allegations. Because Singh was definitely informed as to the charges against him, enabled to present his defense, not taken by surprise at trial, and protected against another prosecution for the same offense, and because the jury was instructed in accordance with the language of the indictment, the claim of constructive amendment must fail. *See United States v. Knuckles,* 581 F.2d 305, 311–12 (2d Cir. 1978).

III. *Sufficiency of the Evidence*

■ Singh challenges the sufficiency of the evidence of intent to defraud in regard to the health care fraud counts charged under 18 U.S.C. § 1347. This challenge is based on his claim that "the government's position that CPT Codes 99212–99215 may only be used when a physician has face-to-face involvement with patients is not supported by the applicable codes." Singh recognizes that his burden is a heavy one. *See United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.1996). In our review, we are constrained to consider the evidence in a light most favorable to the government, to draw all permissible inferences in the government's favor and to favor the jury's verdict in resolving issues of credibility. *See United States v. Desena,* 260 F.3d 150, 154 (2d Cir.2001). Indeed, the conviction must stand if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Spencer,* 129 F.3d 246, 248, 251 (2d Cir. 1997). Applying these rules of appellate review, we conclude that Singh has failed to carry his burden.

■ Singh's contention that the billing codes and rules were sufficiently ambiguous to preclude a finding of fraudulent intent on his part is belied by the evidence. There are in fact no ambiguities in the billing requirements. Code 99211 is the only proper billing code for visits conducted by nurses, and even that code covers services that "*may* not require the presence of a physician." AMA, *CPT Guidebook* 11 (1998) (emphasis added). Codes 99212 through 99215 cover services for various lengths of time that a physician "typically spend[s] ... face-to-face with the patient." *Id.* at 11; *see also id.* at 12–13. Singh interprets the word "typically" in that phrase as allowing a rational jury to conclude that a patient need not spend *any* face-to-face time with a physician in order to justify billing at the higher codes. We think that no rational jury could arrive at such a conclusion, given (1) that the "typically" phrase includes, for each code, a statement of the length of time to be spent with the patient; and (2) the "may not require" phrase in the lowest code, 99211, is not found in the instructions for the higher codes.

■ Nor could a rational jury find ambiguities sufficient to negate fraudulent intent, as Singh suggests, in the Medicare rules that allow billing for services performed by registered nurses when those services are "incident to" a physician's ser-

vices. The requirements for "incident to" billing are that the physician must be present in the office suite and available to provide assistance. This requirement is plain enough, and there is ample proof that Singh did not comply with it. Moreover, the nurse rendering the service contemplated must be "perfectly capable of rendering" such services. The services performed here, i.e., the prescribing of drugs, were not of the type that registered nurses are perfectly capable of performing. Indeed, the AMA Billing Manual requires that "[t]he physician must be readily available" to justify a billing under code 99211, the lowest code. Yet, Singh was billing at the higher codes for services rendered when no physicians were readily available in the office suite.

The evidence was sufficient to support a conclusion by the jury that Singh was fully aware of the billing rules and that his claims for reimbursement submitted under codes 99212–15 falsely represented that a physician had participated in face-to-face meetings with patients. He admitted that he was familiar with the CPT Guidebook, which was kept in his office and referred to for billing purposes. Singh also had a separate billing manual published by the American Medical Association relating specifically to pain management services. Singh's discussions with his employees revealed his detailed knowledge of the billing requirements and provided significant circumstantial evidence of his fraudulent intent. Fraudulent intent is, of course, often established by circumstantial evidence, see *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir.1984), being "rarely susceptible of direct proof," *United States v. Sullivan*, 406 F.2d 180, 186 (2d Cir.1969).

Circumstantial evidence of fraudulent intent presented against Singh included the following: Singh instructed Nurse Madej to include in her dictation notes, for her nurse-only visits, information that would falsely suggest that he had been involved in the visits so that he could obtain reimbursement for those visits. He instructed his staff to bill at higher codes without knowing what had occurred during patient visits in his absence. Following a surprise visit by a State Medical Investigator in 1997, Singh told Nurse Cerone that it was "good" that she had altered charts to represent that she had consulted Singh about the treatment of a patient. And in post-indictment discussions with Nurse Cerone about the charges he faced, Singh did not profess confusion about the billing rules or lack of knowledge of the falsity of his billings. Instead, he opined that the Government would be unable to prove the underlying facts that would establish the falsity of the billings because, among other things, patients would never testify and would not remember who had seen them on a particular date.

Singh's reliance on *United States v. Siddiqi*, 959 F.2d 1167 (2d Cir.1992) (direct appeal) and *Siddiqi v. United States*, 98 F.3d 1427 (2d Cir.1996) (habeas appeal) is misplaced. In that case, an oncologist, convicted by a jury of fraudulent billing for chemotherapy treatments actually administered by hospital staff, presented evidence that he had arranged for another physician to be on call when he was out of the country. See 959 F.2d at 1170–71. The billing code in that case, 96500, provided that a physician could seek reimbursement for "[c]hemotherapy injection, intravenous, single premixed agent, administered by qualified assistant under supervision by physician; by push technique." *Id.* at 1170. No further definition was provided in the billing manual. Accordingly, we wrote as follows: "Absent some affirmative reason to believe that use of code 96500 does not cover being available,

billing under that code is at worst an attempt to bill at the outer limits permitted, not fraud." 98 F.3d at 1439.

A comparison between the code employed in *Siddiqi* and the codes used by Singh reveals an obvious difference. The term "supervision" in *Siddiqi* was susceptible of varying interpretations. The term was in fact ambiguous, and "considerable confusion existed over how to bill . . . for chemotherapy." *Id.* at 1430. No such confusion existed in the codes employed by Singh, and there was no evidence that anybody other than Singh found the language of codes 99211 through 99215 so unclear as to justify billing for nurse-only services under codes other than 99211. In point of fact, of all the witnesses to testify in regard to billing issues, only Singh read the language of the codes as allowing for billing at the higher codes when no physician was present. The evidence was more than sufficient for the jury to find that the relevant codes (other than 99211) require face-to-face physician involvement and to find fraudulent intent on the part of Singh in his billings at the higher codes without such involvement.

## IV. *Forfeiture of Medical License*

■ Contending that medical licensure is exclusively within the province of the states, Singh contends that the statutory provision under which his medical license was declared forfeit is violative of the Tenth Amendment. The provision, 21 U.S.C. § 853(a), provides in pertinent part that any person convicted of a drug felony "shall forfeit to the United States, irrespective of any provision of State law . . . any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation." Here, "property" is defined to embrace "tangible and intangible personal property, including rights, privileges, interests, claims and securities." 21 U.S.C. § 853(b)(2). The Tenth Amendment, of course, states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States are reserved to the States respectively, or to the people."

We reject Singh's contention. Singh relies primarily on *Linder v. United States*, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819 (1925). Linder, a physician, was charged with violation of the Harrison Narcotics Law (the "Harrison Act"), a revenue measure that required registration of persons who sold certain drugs. 268 U.S. at 12, 45 S.Ct. 446. Section 2 of the Harrison Act made it unlawful for anyone to sell, barter, exchange, or give away the covered drugs without a written order of the person to whom the drug was to be dispensed, but exempted physicians. *Id.* at 13, 15, 45 S.Ct. 446. Linder allegedly dispensed two drugs covered by the Harrison Act to a person known to him to be an addict and not to have a legitimate need for the drugs. *Id.* at 16, 45 S.Ct. 446. The Supreme Court considered whether Section 2 applied to Linder's actions in light of three general principles: (1) the Harrison Act was a revenue measure and "whatever additional moral end it may have in view must be reached only through a revenue measure and within the limits of a revenue measure"; (2) in exercising its delegated power, Congress could not "pass laws for the accomplishment of objects not entrusted to the Federal Government"; and (3) "a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Id.* at 17–18, 45 S.Ct. 446 (internal quotation marks omitted).

Recognizing that "direct control of medical practice in the states is beyond the power of the Federal Government, the

*Linder* Court held that '[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure.'" *Id.* at 18, 45 S.Ct. 446. Because dispensation of a few tablets to an addict did not create a "reasonable probability" that she would sell those tablets and evade the tax imposed by the Government, the Court held that Linder could not be prosecuted under Section 2. *Id.* at 22, 45 S.Ct. 446.

*Linder* does not govern this case, because, among other reasons, the Government prosecuted Singh under the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq., not the Harrison Act. The CSA "was intended to 'strengthen,' rather than to weaken, 'existing law enforcement authority in the field of drug abuse.'" *United States v. Moore,* 423 U.S. 122, 132, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975) (quoting Pub.L. No. 91–513, pmbl., 84 Stat. 1236, 1236 (1970)). Thus, the CSA mandates criminal penalties for the illegal dispensation or distribution of narcotics, including forfeiture of property used to effectuate the crime. *See* 21 U.S.C. § 853(a)(1). This forfeiture provision serves the purpose of the CSA, strengthening law enforcement in the area of drug abuse, much more directly than criminalizing a doctor's dispensation of four narcotic tablets to a patient served the revenue-enhancing purpose of the Harrison Act.

■ In addition, the forfeiture has only a de minimis effect on the state's acknowledged authority to regulate the practice of medicine. As the Eleventh Circuit Court of Appeals pointed out, the forfeiture of a medical license used to facilitate a narcotics offense does not prevent the state from issuing a new license. *See United States v. Dicter,* 198 F.3d 1284, 1291–92 (11th

Cir.1999). We therefore agree with the Eleventh Circuit that the Tenth Amendment does not bar forfeiture of a medical license that has been used to facilitate a narcotics crime. *See id.* at 1291.

The two decisions of this court relied upon by Singh are unavailing to support his argument against forfeiture. *See United States v. Sterber,* 846 F.2d 842 (2d Cir.1988); *United States v. Pastore,* 537 F.2d 675 (2d Cir.1976). In *Sterber,* we determined that the District Court could not impose the surrender of a state pharmacy license as a condition of probation. We did not decide that question on constitutional grounds. However, we did

> question whether a federal district judge, "unguided by Congress except in the most general terms," can require a defendant to give up a state-granted professional license, particularly where the state provides a comprehensive regulatory system to handle the professional misconduct of those it licenses.

*Sterber,* 846 F.2d at 844 (quoting *Pastore,* 537 F.2d at 682). In *Pastore,* we determined that resignation from the bar as a condition of probation was invalid in the face of administrative alternatives. We did not reach the constitutional question in that case either. Aside from the fact that forfeiture was not imposed on Singh as a condition of probation, there is now a specific provision for forfeiture of property used to facilitate the commission of a violation, and it can no longer be said that a District Court is "unguided by Congress." *Id.* at 844. Singh utilized his medical license as property to commit his narcotic crimes, and that license therefore is subject to forfeiture under § 853(a).

■ We note that following the guilty verdict in this case, the parties agreed that the court, rather than the jury, would determine whether the government had proven the requisite causal connection be-

tween the drug offenses of which Singh was convicted and the medical license sought to be forfeited. *See* Fed.R.Crim.P. 32.2(b)(4). The District Court, in its preliminary order of forfeiture, dated May 20, 2003, made a finding that the government had established the requisite nexus between the medical license and the offenses (SPA 4), and we see nothing in the record to suggest that that finding was clearly erroneous.

### V. *Sentencing Issues in the Singh Case*

Singh advances three bases for his challenge to the District Court's finding that loss was sustained in an amount between $350,000 and $500,000. This finding supported a nine-level increase in the offense level ascribed to Singh. We note here that the parties stipulated, for restitution purposes only, to a loss of $227,127.82.

Contending that the loss amount should include only claims submitted for services rendered on dates when no physician from the Practice was in the office suite or on the Hospital premises, Singh asserts that there were only nine days when such absences prevailed. Claims billed for follow-up visits on those days, according to Singh, totaled $7,571.86, and $4,088.31 was reimbursed by insurance carriers. To support this argument, Singh points to the jury verdict acquitting him of eleven of the twenty-eight counts of health care fraud (Counts 1–11). (Not pertinent here is Singh's acquittal on health care fraud counts 29–40, relating to the "upcoding") These counts pertain to the period October 8, 1996 to September 27, 1997 and involved times when Singh was either in his Port Chester office or on vacation. He concludes from this that the jury must have acquitted on these counts because, on the nine days in question, as least one physician was available either in the office suite or elsewhere in the Hospital. Singh billed

for nurses' services on those days under CPT billing codes 99212 through 99215, certifying that the services were personally furnished by him or were furnished "incident to" his services. He testified that he believed that he properly billed for follow-up services by the nurses pursuant to the "incident to" rubric and because he was familiar with the overall management of patient care.

The fact that the jury acquitted Singh on some of the health care fraud counts does not support his contention. The acquittals merely represented jury determinations that specific executions of the scheme to defraud had not been proved beyond a reasonable doubt. The conviction on the other counts did not demonstrate any inconsistency in the overall verdict. The Sentencing Guidelines require that the offense level be calculated on the basis of "all acts … committed, aided, abetted, counseled, commanded, induced, procured, or wilfully caused by the defendant … that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1). It is well-settled that acquitted conduct can be taken into account in sentencing and that a preponderance of the evidence is all that is required to prove the amount of loss. *See United States v. Watts,* 519 U.S. 148, 149, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997). Although Singh contends that, in the wake of *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the jury must find that the facts underlying sentencing enhancements have been proven beyond a reasonable doubt, we have determined that district courts shall continue to apply the Guidelines as written, including the use of a preponderance-of-the-evidence standard, unless and until the Supreme Court holds the Guidelines or a portion thereof invalid pursuant to *Blakely. See*

*United States v. Mincey*, 380 F.3d 102, 103 (2d Cir.2004).

▮ The offense of conviction here was the health-care-fraud scheme—the illegal and fraudulent billing by Singh under codes 99212 through 99215 for nurses' services in the absence of any face-to-face contact between physician and patient. It matters not that various phases of the execution of the scheme were rejected by the jury for reason or reasons unknown. Singh's opinions regarding the legality of his billing practices were rejected by the jury, which clearly found the existence of an overall fraudulent scheme. That scheme was conceived and conducted by Singh, who thereby became responsible for all the acts that he aided, abetted, counseled, and caused in perpetrating it. In sentencing Singh, the District Court made no clearly erroneous findings. A preponderance of the evidence supported the District Court's conclusion that the loss encompassed *all* of the nursing visits fraudulently billed as if there were face-to-face contact between physician and patient.

▮▮ Singh next contends that the loss figures identified by amount but not by the victim insurance company should not have been included in the loss calculation and that the amount should have been reduced by the value of services actually provided. As to the lack of identification of victim insurance companies in connection with the Singh claims for reimbursement in certain cases, it is notable that the information regarding these claims was taken from the computer system main-tained at the Practice. Although specific victims were not identified, the entries were otherwise complete and included dates of service, treating nurses, CPT codes, charges for treatment and other information relevant to the false claims that the entries concerned. Sufficient information was available to support the inclusion of the false claims and the estimate of loss due to the fraudulent scheme. A reasonable estimate of the loss is all that is necessary in any event. *See* U.S.S.G. § 2F1.1, cmt. n.9 (1998).[2]

▮ Relying on *United States v. Maurello*, 76 F.3d 1304 (3d Cir.1996), Singh contends that he should be entitled to credit for reimbursable services actually provided. In *Maurello*, a disbarred lawyer provided services to clients under a false name. In connection with the loss calculation necessary to establish the offense level for the defendant's sentencing on his conviction for mail fraud, the Court held as follows: "To the extent that the unauthorized services provided by defendant have not harmed their recipients, but to the contrary have benefitted them, we conclude that defendant's base offense level should not be enhanced." *Id.* at 1312. In response, the Government asserts that Singh was not even entitled to bill at the 99211 code for the nurse-patient visits because the "incident to" requirements were not met and because the victim health care benefits programs would not have reimbursed at that level. The Government contends that the failure to perform this offset was not clear error in any event.

---

**2.** In November 2001, U.S.S.G. § 2F1.1 was deleted from the Guidelines and combined with § 2B1.1. *See* U.S.S.G. § 2F1.1 (2001 historical note). As a general matter, a court should employ "the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a). In this case, however, had the District Court applied the then-current Guidelines, it would have subjected Singh to a greater offense level, *compare* U.S.S.G. § 2B1.1(b)(1)(G) and (H) (2002), *with* U.S.S.G. § 2F1.1(b)(1)(J) (1998), thus violating the Ex Post Facto Clause, *see* U.S.S.G. § 1B1.11(b)(1) (2002). Accordingly, the District Court applied the version of § 2F1.1 contained in the 1998 Guidelines.

We need not respond to either contention, because it appears that the District Court accepted the loss figure of $442,223.29 proposed by the Probation Department. Even assuming the propriety of the $59,572.79 set-off for charges that Singh claims were properly reimbursable under the 99211 code, the total loss for purposes of calculating the offense level would still exceed $350,000, justifying the nine-level increase. *See* U.S.S.G. § 2F1.1(b)(1)(J) (1998).

■ Finally, Singh contends that the loss is overstated by the amount that he could not reasonably have expected to receive, given the rate schedules established by the various health care benefit programs that were victimized by his fraudulent scheme. He asserts that he never intended or expected to receive the full amounts billed because all the programs capped the amount of payment for each service performed. The Sentencing Guidelines provide that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, cmt. n. 8 (1998). Singh asserts that the intended loss should have been computed on the basis of the amounts actually paid by the insurance companies, rather than on the basis of the billings. Given that the insurance companies routinely paid less than they were billed for the services, Singh argues that he never intended or expected to receive the full amounts billed. The government responds only that Singh's failure to provide proof as to his actual intentions regarding reimbursements caps defeats his contention.

We recently had occasion to review a calculation of intended loss in determining offense level in a case involving multiple unsuccessful attempts to withdraw cash advances on fraudulently obtained credit cards. *See United States v. Ravelo*, 370 F.3d 266 (2004). We affirmed the District Court's finding that the "intended loss included all of [defendant's] attempts to draw down money on the credit cards even though it was in fact impossible for him to have drawn down more than the actual cash-advance limit of the cards." *Id.* at 273. The defendant had argued that his chargeable intended loss could only be the cash-advance limits of the credit cards. In rejecting those arguments, we reasoned that the defendant,

> despite the ample opportunity he had to do so, offered no direct evidence at the hearing or elsewhere as to his knowledge or belief regarding the credit-card cash-advance limits, his intent to constrain the amount of loss he caused to those limits, or whether the limits were in fact in the amounts he claims.

*Id.*

It seems to us that there are significant differences between the *Ravelo* case and the case at bar. Singh was intimately familiar with the billing procedures of the Practice. It does not require a leap of logic to infer that he knew full well that he would not be entirely reimbursed on his billing claims. Indeed, "[i]t is common knowledge that Medicare and private insurers pay fixed rates for medical procedures." *United States v. Nachamie*, 121 F.Supp.2d 285, 293 n. 6 (S.D.N.Y.2000). Even patients know that the amounts billed to insurance companies and Medicare by health care providers are higher than the fixed amounts paid. *Id.* Because of Singh's status as a physician and one familiar with the billings and receipts of his medical practice, an inference surely can be drawn here, as it could not be drawn in *Ravelo*, of the loss he intended to cause through his fraudulent scheme. In *Ravelo*, there was no way for the defendant to know the credit card limits and

therefore the ultimate amount that he would have been able to draw. 370 F.3d at 273.

*United States v. Miller*, 316 F.3d 495, 504–05 (4th Cir.2003) was cited in *Ravelo* for having adopted a "similar approach[ ] in analogous circumstances." *Ravelo*, 370 F.3d at 273 n. 6. In *Miller*, a mail-fraud case involving overbilling of Medicare and Medicaid, no evidence was introduced that the defendant actually intended to bill only as much as provided in the Government fee schedule, and the actual amounts billed were held to have constituted the intended loss. *See* 316 F.3d at 501, 504. The case before us is somewhat different, for *Miller* involved a guilty plea, *id.* at 496, whereas here Dr. Singh took the witness stand and testified at length about the practices of his Practice, although not about his specific intentions in regard to the receipt of capped amounts. In any event, we reject the holding in *Miller* to the extent that it is inconsistent with our holding in this case.

Also supporting our determination to remand on the question of intended loss, we note that Singh has stipulated, for purposes of restitution only, that the total amount due the insurers is $227,127.82, a figure substantially less than the amounts billed. This could be considered an acknowledgment by Singh that he did not expect to receive reimbursement in the amounts billed. We think that Singh should have a further opportunity on re-

mand to show, if he can, that the total amount he expected to receive from the insurers was indeed less than the amounts he actually billed.

## CONCLUSION

We vacate the judgment of the District Court in regard to the calculation of the loss upon which the offense level is based, and we remand for further proceedings as to that matter in accordance with the foregoing; we affirm the judgment of the District Court in all other respects.[3]

---

3. The mandate in this case will be held pending the Supreme Court's decisions in *United States v. Booker*, No. 04–104, and *United States v. Fanfan*, No 04–105 (both to be argued October 4, 2004). *See* 2004 U.S. LEXIS 4788 (Aug. 2, 2004) (mem.); 2004 U.S. LEXIS 4789 (Aug. 2, 2004) (mem.); *see also Mincey*, 380 F.3d 102, 106. Should any party believe there is a need for the District Court to exercise jurisdiction prior to the Supreme Court's decision, that party may file a motion seeking issuance of the mandate in whole or in part.

Although any petition for rehearing should be filed in the normal course, pursuant to Rule 40 of the Federal Rules of Appellate Procedure, this Court will not reconsider those portions of its opinion that address Singh's sentence until after the Supreme Court's decision in *Booker* and *Fanfan*. In that regard, the parties will have until fourteen days following the Supreme Court's decision to file supplemental petitions for rehearing in light of *Booker* and *Fanfan*.