JEFFREY SEIDEMAN & others[1] vs. CITY OF NEWTON.

Middlesex. September 2, 2008. - October 24, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Practice, Civil,* Taxable inhabitants' action. *Zoning,* Limitation on rate of development. *Massachusetts Community Preservation Act.*

Discussion of the Community Preservation Act, G. L. c. 44B, which provides a method for municipalities to fund the acquisition, creation, and preservation of open space and historic resources, and the creation and preservation of community housing. [473-474]

In an action brought by local taxpayers of the city of Newton (city), challenging the legality of the city's appropriation of funds pursuant to the Community Preservation Act (Act), G. L. c. 44B, for various rehabilitation and restoration projects at two parks, the judge correctly granted summary judgment in favor of the taxpayers, where the proposed projects did not fall within the purview of the Act and, therefore, could not be funded under that statute. [477-480]

CIVIL ACTION commenced in the Superior Court Department on May 25, 2006.

The case was heard by *Bruce R. Henry,* J., on a motion for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Donnalyn B. Lynch Kahn,* Associate City Solicitor (*Daniel Funk,* City Solicitor, with her) for the defendant.

*Guive Mirfendereski* for the plaintiffs.

*Stephen D. Anderson, Kevin D. Batt, & Nina Pickering,* for town of Acton, amicus curiae, submitted a brief.

SPINA, J. On May 25, 2006, ten taxpayers (taxpayers) of the city of Newton (Newton) commenced this action for declaratory

[1] Linda L. Lancaster, Samuel M. Robbins, William H. Heck, Alvan F. Rosenberg, Beverly I. Rosenberg, Michael F. McGrath, Deborah J. Donahue, M. Brewster Abele, and Arnold Garrison.

and injunctive relief in the Superior Court, challenging the legality of Newton's appropriation of $765,825 in funds pursuant to the Massachusetts Community Preservation Act (CPA), G. L. c. 44B, for various projects at Stearns Park and Pellegrini Park (collectively, the parks).[2] The taxpayers subsequently filed a motion for summary judgment on the grounds that the proposed projects did not fall within the purview of the CPA and, therefore, could not be funded under that statutory enactment. The motion judge agreed and granted summary judgment to the taxpayers. Newton appealed, and we granted its application for direct appellate review. For the reasons that follow, we now affirm.[3]

The CPA, enacted by the Legislature on September 14, 2000, see St. 2000, c. 267, provides a method for municipalities to fund "the acquisition, creation and preservation of open space, the acquisition, creation and preservation of historic resources and the creation and preservation of community housing." G. L. c. 44B, § 2. Given the "enormous pressures faced by rural and suburban towns presented with demands of development, and that towns may seek to prevent or to curtail the visual blight and communal degradation that growth unencumbered by guidance or restraint may occasion," a municipality may seek to preserve its character and natural resources by, among other actions, accepting the provisions of the CPA in an effort to "limit growth by physically limiting the amount of land available for development." *Zuckerman* v. *Hadley*, 442 Mass. 511, 517-518 (2004).

The CPA states that "[s]ections 3 to 7, inclusive, shall take effect in any city or town upon the approval by the legislative body and their acceptance by the voters of a ballot question as set forth in this section."[4] G. L. c. 44B, § 3 (*a*). Notwithstanding any contrary laws, "the legislative body may vote to accept

---

[2] General Laws c. 40, § 53, provides that ten taxpayers of a municipality may bring suit to enforce laws relating to the expenditure of tax money by local officials. See *Edwards* v. *Boston*, 408 Mass. 643, 646 (1990), and cases cited.

[3] We acknowledge the amicus brief filed by the town of Acton.

[4] The Massachusetts Community Preservation Act (CPA), G. L. c. 44B, defines the "[l]egislative body" as "the agency of municipal government which is empowered to enact ordinances or by-laws, adopt an annual budget and other spending authorizations, loan orders, bond authorizations and other

sections 3 to 7, inclusive, by approving a surcharge on real property of not more than 3 per cent of the real estate tax levy against real property, as determined annually by the board of assessors." G. L. c. 44B, § 3 (b). The legislative body, here the board of aldermen of Newton, also may vote to accept certain exemptions to the imposition of the surcharge. See, e.g., G. L. c. 44B, § 3 (e). "Upon approval by the legislative body, the actions of the body shall be submitted for acceptance to the voters of a city or town at the next regular municipal or state election." G. L. c. 44B, § 3 (f). The voters of Newton accepted G. L. c. 44B, §§ 3-7, in November, 2001.[5]

After acceptance of G. L. c. 44B, §§ 3-7, a municipality "shall establish by ordinance or by-law a community preservation committee," G. L. c. 44B, § 5 (a), the task of which is to "study the needs, possibilities and resources of the city or town regarding community preservation." G. L. c. 44B, § 5 (b) (1). Based on the information gathered, after consultation with existing municipal boards and public informational hearings, "[t]he community preservation committee shall make recommendations to the legislative body for the acquisition, creation and preservation of open space; for the acquisition, preservation, rehabilitation and restoration of historic resources; *for the acquisition, creation and preservation of land for recreational use*; for the acquisition, creation, preservation and support of community housing; *and for the rehabilitation or restoration of open space, land for recreational use and community housing that is acquired or created as provided in this section*" (emphasis added). G. L. c. 44B, § 5 (b) (2). After receiving the committee's recommendations, the legislative body shall take such actions and approve such appropriations as it deems necessary to implement the recommendations. G. L. c. 44B, § 5 (d).

Newton owns and operates the parks, which have been used for recreational purposes since before the enactment of the CPA. Stearns Park is approximately 3.5 acres of land, and it

___

financial matters and whether styled as a city council, board of aldermen, town council, town meeting or by any other title." G. L. c. 44B, § 2.

[5] In Newton, the CPA is funded by a one per cent surcharge on the annual real estate tax levy. In addition, Newton, like other municipalities that have accepted G. L. c. 44B, §§ 3-7, is eligible to receive annual distributions from the Massachusetts Community Preservation Trust Fund, see G. L. c. 44B, § 9.

encompasses "both passive and active recreation areas, including a large open space with benches, game tables, walkways; a basketball court; a little league baseball diamond; a tot-lot; swing sets; and two tennis courts." Pellegrini Park comprises approximately 4.5 acres, and it has "many active recreation options including soccer, softball, two tennis courts, indoor and outdoor basketball, indoor volleyball, and children's play structures."

On October 3, 2005, the Newton parks and recreation department, together with other interested entities, submitted an application to the community preservation committee for CPA funds to undertake substantial improvements at the parks. These improvements would constitute "Year 1" of a four-year project. Newton's community preservation committee recommended to the board of aldermen of Newton (board) that CPA funds be appropriated in accordance with the application. In Newton's view, the scope of the work is "designed to improve the parks' overall appearance by reorganizing existing park facilities, grouping the playground structures together, building a new tennis court (for Stearns Park) and reconfiguring and relocating the basketball courts, improving curb appeal through landscaping and [the] addition of new fencing, creating new paths, installing water fountains, constructing bleachers, installing additional lighting, interpretive signage and picnic tables, and preserving the ball fields." The project "contains recreation elements to meet the needs of children and adults for both passive and active uses. For children, play areas will be reconstructed with modern equipment and low-maintenance rubberized surfaces that reduce injuries from falls. Older children and adults will benefit from resurfaced basketball and tennis courts and improved soccer and softball fields. Passive recreation needs will be satisfied by realigned and resurfaced pathways and linkages to the street and nearby elderly housing." On May 15, 2006, the board approved the appropriation of $765,825 in CPA funds for "Year 1" project costs.[6] The present action by the taxpayers against Newton ensued.

In considering the taxpayers' motion for summary judgment, the judge stated that judicial interpretation of G. L. c. 44B,

---

[6]Of the total appropriation of $765,825, the sum of $762,125 was designated for "Recreation Projects," and $3,700 was designated for "Legal Expenses."

§ 5 (*b*) (2), was determinative of whether CPA funds properly could be used for the proposed projects at the parks. The judge pointed out that there was no dispute that the parks were neither acquired nor created with CPA funds in the first instance.[7] He declined to adopt Newton's construction of the word "creation," stating that because the parks have been dedicated to recreational uses for some time, predating the enactment of the CPA, the proposed projects did not "create" land for recreational use. Although Newton attempted to characterize some of the proposed projects as "preservation,"[8] the judge stated that clearly what was planned was "the rehabilitation and/or restoration" of the parks, in keeping with their recreational purposes. Further, the judge continued, while the appropriation of CPA funds for the "rehabilitation"[9] or "restoration"[10] of land for recreational use is permitted under G. L. c. 44B, § 5 (*b*) (2), it is permitted only for recreational land that was originally acquired or created with CPA funds. That, the judge reiterated, did not occur here. Accordingly, because Newton's proposed uses for the CPA funds did not comport with any of the authorized uses set forth in § 5 (*b*) (2), the judge concluded that such funds could not be appropriated for the projects at the parks, and the taxpayers were entitled to summary judgment.[11]

The focus of Newton's appeal is the construction of G. L.

[7]General Laws c. 44B, § 2, defines "[a]cquire" as "obtain by gift, purchase, devise, grant, rental, rental purchase, lease or otherwise," but the term does not encompass "a taking by eminent domain, except as provided in this chapter." The CPA does not define the term "create."

[8]General Laws c. 44B, § 2, defines "[p]reservation" as the "protection of personal or real property from injury, harm or destruction, but not including maintenance." The term "[m]aintenance" is defined as "the upkeep of real or personal property." *Id.*

[9]General Laws c. 44B, § 2, defines "[r]ehabilitation" as "the remodeling, reconstruction and making of extraordinary repairs to historic resources, open spaces, lands for recreational use and community housing for the purpose of making such historic resources, open spaces, lands for recreational use and community housing functional for their intended use, including but not limited to improvements to comply with the Americans with Disabilities Act and other federal, state or local building or access codes."

[10]General Laws c. 44B, § 2, does not define the term "restoration."

[11]"The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law." *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass.

c. 44B, § 5 (*b*) (2), which permits the appropriation of CPA funds "for the acquisition, creation and preservation of land for recreational use." Newton contends that the word "creation," which is not defined in G. L. c. 44B, § 2, should be construed broadly to include not only the creation of physical land for a park, but also the creation of new recreational uses within existing parks that would make the areas open and accessible to new groups of users, including those who are disabled. Such an interpretation, Newton continues, would reflect more accurately the intention of the CPA to promote recreational spaces within municipalities. Further, Newton argues that the proposed projects at the parks would go well beyond the mere maintenance of such real property. In Newton's view, given that the projects would prevent significant destruction of the green spaces, through improved drainage, fencing, and curbing, the proposed projects should be considered, more accurately, the "preservation" of land for recreational use, not the mere maintenance of such property for which CPA funds could not be appropriated.

Our analysis of G. L. c. 44B, is guided by the familiar principle that "a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). See *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001), and cases cited. Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense. See *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996); *Pentucket Manor Chronic Hosp., Inc.* v. *Rate Setting Comm'n*, 394 Mass. 233, 240 (1985). Words that are not defined in a statute should be given their usual and accepted

356, 358 (1997). See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue. See *Pederson* v. *Time, Inc.*, 404 Mass. 14, 17 (1989). Any doubts as to the existence of a genuine issue of material fact are to be resolved against the party moving for summary judgment. See *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 371, cert. denied, 459 U.S. 970 (1982).

meanings, provided that those meanings are consistent with the statutory purpose. See *Commonwealth* v. *Zone Book, Inc.*, 372 Mass. 366, 369 (1977); *Kemble* v. *Metropolitan Dist. Comm'n,* 49 Mass. App. Ct. 165, 166 (2000). "We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." *Commonwealth* v. *Zone Book, Inc., supra.*

It is significant in this case that the parks have been devoted to recreational uses since before the enactment of the CPA. Contrary to the statutory construction proposed by Newton, the appropriation of CPA funds pursuant to the language of G. L. c. 44B, § 5 (*b*) (2), is for the creation of land for recreational use, not the creation of new recreational uses on existing land already devoted to that purpose. The word "create" means "[t]o bring into being" or "to cause to exist." Black's Law Dictionary 366 (6th ed. 1990). Land for recreational use is not being created where a municipality chooses simply to enhance or redevelop that which already exists as such. However, to the extent that a municipality chooses to convert land that had been used for a purpose other than recreational use, including blighted land, or land that, at some point in the past, ceased to exist for recreational purposes, that action by the municipality would constitute the creation of land for recreational use, and CPA funds could be appropriated for the necessary costs of the project. Such statutory construction is in keeping with an underlying principle of the CPA to preserve the character and natural resources of a municipality, particularly its open space, in the face of growing urbanization and development. See G. L. c. 44B, § 2 (defining "[o]pen space" as including "land for recreational use"). It also constitutes a recognition that in many communities there simply is little available open space, but that real property no longer being used for its original purpose can be transformed to create a new purpose, such as recreational use.

As to Newton's contention that its proposed projects at the parks constitute the "preservation" of land for recreational use, we conclude that the work for which Newton has sought CPA funds is not designed for the "protection of . . . real property from injury, harm or destruction." G. L. c. 44B, § 2. Rather, Newton has requested the appropriation of CPA funds for extensive improvements and upgrades to the parks. Projects of this

nature are not encompassed by the statutory definition of "preservation."

In its application to the community preservation committee, Newton stated that, over the years, enhancements had been made to the parks with funds from both the parks and recreation department and the community development block grant program, including the installation of new light fixtures, game tables, and benches, the purchase of new play equipment, the construction of a retaining wall and fence, the partial paving of a parking lot, and the planting of new trees. While, in Newton's view, the improvements had left the parks "in passable condition," neighborhood residents did not feel that the parks were "fully meeting the recreational needs of the community." Newton's goals with respect to the proposed projects are to maximize recreational opportunities; improve accessibility; bring an orderly flow to the fragmented sections of the parks; enhance beautification; use better materials to raise standards of safety and cleanliness; increase park usage; improve signage, decorative fencing, and landscaping; provide more seating throughout the parks; and boost the spirit and involvement of the neighborhood community.

Newton is not seeking to "preserve" the parks by protecting them from decay and destruction, see G. L. c. 44B, § 2, but to improve substantially the parks' over-all quality, attractiveness, and usage. We agree with the motion judge that the proposed projects set forth in Newton's application to the community preservation committee fall more squarely within the definition of "rehabilitation," which includes "the remodeling, reconstruction and making of extraordinary repairs" to "lands for recreational use" so that they will be "functional for their intended use, including but not limited to improvements to comply with the Americans with Disabilities Act." G. L. c. 44B, § 2. However, the appropriation of CPA funds for the parks' "rehabilitation" is not permitted under G. L. c. 44B, § 5 (*b*) (2), where, as here, it is undisputed that the parks were not acquired or created with such funds in the first instance.[12]

Newton next asserts that the judge erred in allowing the

---

[12]The parties do not discuss the appropriation of CPA funds for the "acquisition" of land for recreational use, as permitted under G. L. c. 44B, § 5 (*b*) (2). Nonetheless, pursuant to G. L. c. 44B, § 2, a municipality can "[a]cquire" land for recreational use "by gift, purchase, devise, grant, rental, rental

taxpayers' motion for summary judgment where, in Newton's view, there were disputed issues of material fact. In particular, Newton points out that it provided an affidavit from its community development planner in which she stated that the proposed projects for the parks include significant aspects of both "creation" and "preservation" within the meaning of the CPA. As such, Newton continues, it was improper for the judge to decide the matter without a trial on the merits. We disagree. Contrary to Newton's assertion, whether the proposed projects constitute the creation and preservation of land for recreational use, as set forth in G. L. c. 44B, is a question of law, not one of fact. The nature of the projects is as Newton has extensively described them in its application for CPA funds. Whether the appropriation of CPA funds for these projects is permissible under the provisions of G. L. c. 44B is a question of statutory interpretation for a court to decide.[13] See *Boston Police Patrolmen's Ass'n* v. *Boston*, 435 Mass. 718, 719 (2002).

*Judgment affirmed.*

---

purchase, lease or *otherwise*" (emphasis added). In its simplest form, this language means that a municipality can, for example, purchase real property for the specific purpose of devoting it to recreational use. Alternatively, the word "otherwise" is broad enough to include a "transfer" of land for recreational use. In that situation, real property already owned by a municipality and designated for a particular purpose could be "acquired" for recreational use, a wholly different purpose, by transferring it from one municipal entity to another. See G. L. c. 40, § 15A (whenever board or officer having charge of land, with certain exceptions, determines that land is no longer needed for particular purpose, legislative body may transfer care, custody, management, and control of such land to another board or officer for another municipal purpose); *Harris* v. *Wayland*, 392 Mass. 237, 242-243 (1984). See also D.A. Randall & D.E. Franklin, Municipal Law and Practice § 27.3 (5th ed. 2006) (control and use of municipal property).

[13]We also have been urged to specify that our interpretation of G. L. c. 44B, § 5 (*b*) (2), will be applied prospectively such that our ruling will have no effect on CPA appropriations already expended by municipalities throughout the Commonwealth. This issue has not been raised by the parties, and we reserve opinion on the matter until it is properly presented. In any event, an action by ten taxpayers under G. L. c. 40, § 53, is subject to laches, see *Zeitler* v. *Hinsdale*, 5 Mass. App. Ct. 778 (1977), and must be brought before obligations are incurred by a municipality. See G. L. c. 40, § 53 ("ten taxable inhabitants" entitled to relief in equity if town is "about to" raise or expend money, or incur obligations); *Kapinos* v. *Chicopee*, 334 Mass. 196, 198 (1956).