NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReportersjc.state.ma.us

SJC-12735

COMMONWEALTH  vs.  FRANK STIRLACCI
(and 135 companion cases[1]).


Hampden.      September 5, 2019. - January 8, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Controlled Substances.  Doctor, Controlled substances,
     Prescription.  Health Care.



     Indictments found and returned in the Superior Court
Department on January 26, 2017.

     Motions to dismiss were heard by Mark D. Mason, J.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Benjamin Shorey, Assistant District Attorney, for the
Commonwealth.
     A.J. O'Donald III for Frank Stirlacci.
     Roy H. Anderson for Jessica Miller.

---

     [1] Sixty-seven against Frank Stirlacci and sixty-eight
against Jessica Miller.

LENK, J.  In 2017, a Hampden County grand jury indicted Dr. Frank Stirlacci and his office manager, Jessica Miller, for numerous violations of the Controlled Substances Act, and for submitting false health care claims to insurance providers.  The charges under the Controlled Substances Act included twenty-six counts each of improper prescribing, G. L. c. 94C, § 19 (a), and twenty counts each of uttering a false prescription, G. L. c. 94C, § 33 (b).  The defendants also were indicted on twenty-two charges each of submitting a false health care claim, G. L. c. 175H, § 2.

A Superior Court judge subsequently dismissed the indictments for improper prescribing and uttering false prescriptions.  Because of insufficient evidence, the judge also expressed an intent to dismiss six of the twenty-two indictments against each defendant for submitting false health care claims. The Commonwealth appealed from the dismissals pursuant to Mass. R. Crim. P. 15 (a) (1), as amended, 476 Mass. 1501 (2017).

For the reasons that follow, we conclude that there was sufficient evidence to indict Stirlacci on twenty-six counts of improper prescribing, but that Miller's status as a nonpractitioner precludes her indictment under that provision. We conclude further that there was insufficient evidence to indict either defendant for uttering false prescriptions. Finally, there was sufficient evidence to indict both defendants

on twenty of the twenty-two counts against each defendant of submitting false health care claims, in violation of G. L. c. 175H, § 2.

1. Background. We recite the facts as the grand jury could have found them, reserving some details for subsequent discussion. The Commonwealth's investigation of Stirlacci, a physician who operated a solo practice with offices in Agawam and Springfield,[2] stemmed from a number of prescriptions issued between April 17, 2015, and May 11, 2015, while he was incarcerated in Louisville, Kentucky.[3] Of particular concern to investigators were fifteen prescriptions for hydrocodone, six prescriptions for oxycodone, two prescriptions for fentanyl, and three prescriptions for methadone.[4]

As part of its investigation, the Commonwealth obtained recordings of Stirlacci's telephone calls made from the Louisville facility where he was being held. In these conversations, he spoke of his inability to raise money to

---

[2] Between the two offices, Stirlacci apparently treated approximately 3,000 patients.

[3] Stirlacci was held in contempt of court in Kentucky for being delinquent on spousal support payments. He was incarcerated from April 17, 2015, to May 11, 2015.

[4] Although it appears from the record that additional prescriptions may have been issued, during the period that Stirlacci was being held, for substances other than narcotics, these twenty-six prescriptions were the focus of the indictments.

satisfy his alimony obligations if he remained incarcerated and unable to see patients. In addition, he expressed concern that he needed to maintain sufficient cash flow to keep his practice open, that he was abandoning his patients, and that he could incur liability if a patient suffered an injury as a result of not being able to obtain necessary medication.

When Stirlacci was on vacation or otherwise out of the office, he typically would leave pre-signed prescription forms for Miller, who was not a medical professional, to use for patients who came in for prescription renewals. While Stirlacci was in jail, he instructed Miller that, if a patient came in seeking a renewal, she should issue it and also submit a claim to the patient's insurance company. Miller sought to clarify whether she could submit claims for visits where Stirlacci would not have seen the patient. Stirlacci told her that even if he did not see the patient, the office was "doing work" and should submit a claim. He also explained that such claims would be "down charg[ed]" because the patient had not seen a doctor.[5]

Subsequent conversations between Miller and Stirlacci reveal Stirlacci's mounting frustration with his inability to

---

[5] The grand jury were not provided with a definition of "down charging," but could have inferred that the phrase implied that a medical office would bill insurance providers at a lower rate if the doctor did not actually see the patient.

run his practice, which he worried would "implode" in his absence. The conversations also indicate that a nurse practitioner employed by Stirlacci[6] raised concerns to Miller about the propriety of Miller issuing renewal prescriptions. In addition, the nurse practitioner objected to Miller billing for patients who had not been examined by Stirlacci on that date. Stirlacci reassured Miller that she knew the proper standards for billing, and she should do what she knew was "right." He also expressed frustration with the nurse practitioner's unwillingness to recognize that small private practices could not afford to follow every regulation if they were going to be successful businesses and remain flexible enough to accommodate patients.

In January of 2017, the Commonwealth convened a grand jury to present the results of its investigation. The evidence submitted to the grand jury included a complete transcript of Stirlacci's telephone calls with Miller and other associates while he was incarcerated in Kentucky. It also included records for twenty-two patients who either were issued prescriptions, or whose insurance providers were billed for office visits, on dates when Stirlacci was in Kentucky and Miller was working in

---

[6] The nurse practitioner ultimately left the practice on May 7, 2015, before Stirlacci returned from Kentucky after May 11, 2015.

the office.  These records included copies of twenty-six prescriptions for narcotics, all issued on dates when Stirlacci was in Kentucky and Miller was at the office.[7]  The records also included copies of billing entries showing that each patient's insurance provider had been billed for an office visit on a date when Stirlacci was in Kentucky.  In some instances, the records also included documents from the patients' insurance companies that referenced the reimbursement claims, thus indicating that a claim had been made.

The Commonwealth's sole witness was a State police trooper who had worked on the investigation.  Although the trooper did not provide a detailed explanation of medical billing practices or what the specific billing codes in the patient records meant, he stated that the records showed that the patients' insurance providers were billed for the patients having seen Stirlacci. The trooper further explained that Stirlacci was not directly issuing the prescriptions from jail, but that Miller was filling out the prescriptions using blank prescription forms that had been pre-signed by Stirlacci.  The trooper also confirmed that all the prescriptions were renewals for ongoing treatment.

---

[7] As discussed supra, fifteen prescriptions were for hydrocodone, six were for oxycodone, two were for fentanyl, and three were for methadone.  Stirlacci's case load was approximately 3,000 patients between his two offices.

The trooper read two excerpts from the transcripts of Stirlacci's telephone calls to Miller while he was incarcerated. In the first conversation, Stirlacci directed Miller to issue prescriptions and submit billing charges for the times when patients came to the office to pick up (renewal) prescriptions.[8] In the second excerpt, Stirlacci and Miller discussed the nurse practitioner's concerns with this arrangement.[9]  The trooper also testified that he had interviewed that nurse practitioner, and read the grand jury her written statement.  Her statement

---

[8] The first excerpt stated in part:

Miller:  "What about people that are picking up scripts, can I put in charges for them?"

Stirlacci:  "Yes"

Miller:  "Even though they weren't seen?"

Stirlacci:  "Yes.  Put in the 99212. . . .  For the date that they picked them up, because they didn't see the doctor, so it's down charged.  So, it's a 92 or a 93. . . . Anything and everything you can get in, get in."

[9] The second excerpt reads as follows:

Miller (summarizing a conversation she had had with the nurse practitioner)]:  "Doc is the one that makes any decisions.  He told me to write scripts, so I'm writing scripts."

Stirlacci:  "Right.  So what does she [not] like?  The patients were seen, they came into the office."

Miller:  "She doesn't like [that we are] writing scripts for patients and then expecting her to do the office thing."

provided an account of the manner in which Stirlacci's medical practice operated in his absence. In addition, the nurse practitioner said that the signatures on the prescription forms issued in Stirlacci's absence were in Stirlacci's handwriting, but that the details of the prescriptions were in Miller's. The nurse practitioner mentioned requests she had received from Miller and from the Springfield office manager (Miller only managed the Agawam office) to complete patient notes for patients she herself had not seen; she refused these requests.

Stirlacci and Miller each were indicted on twenty-six charges of improper prescribing, G. L. c. 94C, § 19 (a); twenty charges of uttering false prescriptions, G. L. c. 94C, § 33 (b); and twenty-two charges of submitting false health care claims, G. L. c. 175H, § 2. After a hearing on the defendants' joint motion to dismiss for insufficient evidence to establish probable cause, the judge dismissed the indictments for improper prescriptions and uttering false prescriptions, and further concluded that there was insufficient evidence as to six of the twenty-two false health care claims.[10] The Commonwealth appealed

---

[10] In order to clarify which specific counts had insufficient evidence, the judge ordered the Commonwealth to submit a bill of particulars. This was necessary because the individual indictments did not identify the patient to whom they pertained. As further proceedings in the Superior Court were stayed pending this appeal, these counts have yet to be dismissed.

to the Appeals Court, and we transferred the consolidated appeals to this court on our own motion.

2. Discussion. The Commonwealth contends that the evidence indicating that Miller provided pre-signed prescriptions to patients when Stirlacci was not present established probable cause either that the prescriptions lacked a legitimate medical purpose or that they were issued outside the usual course of professional practice.[11] The Commonwealth also maintains that evidence that Miller filled out prescriptions which had been pre-signed by Stirlacci established probable cause that both defendants uttered false prescriptions, and that submitting billing claims for these visits established probable cause that both defendants submitted false health care claims.

a. Standard of review. Although, in general, a "court will not inquire into the competency or sufficiency of the evidence before the grand jury" (citation omitted), Commonwealth v. Robinson, 373 Mass. 591, 592 (1977), a "grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him [or her]" for the

---

[11] As discussed in part 2.a, infra, the Commonwealth contends that it is sufficient to establish probable cause that either the prescriptions lacked a legitimate medical purpose or the prescriptions were issued outside the usual course of practice.

crime charged, Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982).  A grand jury may indict when presented with sufficient evidence of "each of the . . . elements" of the charged offense. Commonwealth v. Moran, 453 Mass. 880, 884 (2009).

Probable cause is a "considerably less exacting" standard than that required to support a conviction at trial. Commonwealth v. O'Dell, 392 Mass. 445, 451 (1984).  It requires "sufficient facts to warrant a person of reasonable caution in believing that an offense has been committed," not proof beyond a reasonable doubt.  Commonwealth v. Levesque, 436 Mass. 443, 447 (2002).  An appellate court reviews the evidence underlying a grand jury indictment in the light most favorable to the Commonwealth.  See Commonwealth v. Catalina, 407 Mass. 779, 781 (1990).  In considering a judge's decision to dismiss for lack of sufficient evidence, we do not defer to the judge's factual findings or legal conclusions.  See Commonwealth v. Ilya I., 470 Mass. 625, 627 (2015).

b.  Improper prescribing in violation of G. L. c. 94C, § 19 (a).  The Controlled Substances Act mandates that valid prescriptions for controlled substances "be issued for a legitimate medical purpose by a practitioner acting in the usual course of his [or her] professional practice."  G. L. c. 94C, § 19 (a).  Practitioners who issue invalid prescriptions are subject to criminal penalties.  Id.  To determine whether the

indictments should have been dismissed, we must (a) establish the standard for "improper prescribing" by defining the relationship between "legitimate medical purpose" and "usual course of professional practice"; (b) assess whether the Commonwealth presented sufficient evidence to establish probable cause that there was improper prescribing by a practitioner, and (c) decide whether the explicit reference to practitioners in the Controlled Substances Act precludes liability for a nonpractitioner such as Miller. We conclude that the Commonwealth has met its burden with respect to Stirlacci, but that G. L. c. 94C, § 19 (a), does not impose liability on nonpractitioners such as Miller.

i. Standard for "improper prescribing." "[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language" (citation omitted). Seideman v. Newton, 452 Mass. 472, 477 (2008). In order to effectuate the intent of the Legislature, we consider the text "in connection with the cause of its enactment . . . and the main object to be accomplished." (citation omitted). Id. We discern the intent "from all [of a statute's] parts and from the subject matter to which it relates." Id. We also consider a statute within the context of the broader statutory framework, including prior versions of the same statute and similar enactments. See

Bellalta v. Zoning Bd. of Appeals of Brookline, 481 Mass. 372, 378 (2019).

A. Defining "legitimate medical purpose" and "usual course of professional practice." General Laws c. 94C, § 19 (a), provides that a valid prescription is one issued "for a legitimate medical purpose by a practitioner acting in the usual course of his [or her] professional practice." G. L. c. 94C, § 19 (a). Articulating a standard for improper prescribing requires us to define these two concepts and to determine their respective roles in distinguishing valid prescribing from criminal conduct.

The Commonwealth argues that it is sufficient to prove either that a prescription lacked a legitimate medical purpose or that it was issued outside the usual course of professional practice. In the Commonwealth's view, G. L. c. 94C, § 19 (a), imposes two distinct requirements for a valid prescription: that it (1) have a "legitimate medical purpose" and (2) be issued in the "usual course of professional practice." Thus, the Commonwealth argues, a prescription is improper if the Commonwealth can prove that a practitioner failed to meet just one of these requirements.

We are not convinced by this argument. General Laws c. 94C, § 19 (a), provides that a valid prescription is one issued "for a legitimate medical purpose by a practitioner

acting in the usual course of his [or her] professional practice."  To read "legitimate medical purpose" and "usual course of professional practice" as two distinct requirements would require inserting the word "and" between the two phrases. We "refrain from reading into the statute . . . words that the Legislature . . . chose not to include" (quotation and citation omitted).  Essex Regional Retirement Bd. v. Swallow, 481 Mass. 241, 252 (2019).  Moreover, for the reasons that follow, we conclude that "legitimate medical purpose" and "usual course of professional practice" are best read as a single, holistic standard.

Because neither "legitimate medical purpose" nor "usual course of professional practice" are defined anywhere in the statute, we turn first to the ordinary usage of this language. "Purpose" implies one's goal or intent, Black's Law Dictionary 1493 (11th ed. 2019), while "legitimate" implies something that is "genuine" or "lawful," see id. at 1084.  Accordingly, "legitimate medical purpose" may be read as a genuine or lawful medical intent or goal.  "Usual" implies "ordinary" or "customary."  See id. at 1857.  "Course" implies a "routine." See, e.g., id. at 443 (defining "course of business" as "[t]he normal routine of managing a trade or business" [emphasis added]).  "Professional" means "pertaining to one's profession," here, the medical profession.  See Dorland's Illustrated Medical

Dictionary 1514 (30th ed. 2003). The "usual course of professional practice" thus may be read to mean the routines customarily expected in the context of the medical profession. See United States v. Smith, 573 F.3d 639, 647-648 (8th Cir. 2009) ("usual course of professional practice" refers to "generally recognized and accepted medical practices" [citation omitted]).

From the plain language, then, we can infer that the relevant factors when determining if a practitioner has engaged in improper prescribing are whether the practitioner's intent is not related to a genuine medical objective, and the degree to which the practitioner's conduct deviates from "generally recognized and accepted medical practices." See Smith, 573 F.3d at 647. What remains unclear is the precise relationship between these factors. We therefore turn from the text to a broader consideration of the objectives of the statute.

B. Purpose of G. L. c. 94C, § 19 (a). When crafting the Controlled Substances Act, the Legislature recognized the need to strike a careful balance between allowing medical practitioners to prescribe narcotics where appropriate as medical treatment and preventing the same practitioners from abusing this power to promote the unlawful distribution of these drugs. By its terms, G. L. c. 94C, § 19 (a), both serves to create "an exemption from criminal liability" for practitioners

who issue proper prescriptions and a "gateway to liability" that "makes it possible to prosecute physicians" who issue improper prescriptions.  See Commonwealth v. Brown, 456 Mass. 708, 717-718 (2010).  This fundamental legislative intent can be traced to previous drug laws in the Commonwealth, which use similar language and reflect a concern with ensuring that medical professionals do not use their prescribing authority to evade narcotics controls.[12]

To preserve this careful balance, courts also have held that the prohibition on improper prescribing does not establish criminal liability merely for medical malpractice.  "It is not enough to show that the physician did not comply with accepted medical practice."  Commonwealth v. Kobrin, 72 Mass. App. Ct 589, 596 (2008).  In Commonwealth v. Comins, 371 Mass. 222, 232 (1976), cert. denied, 430 U.S. 946 (1977), we observed that "mere malpractice in the prescribing of drugs has not been made a crime," and that the physician must not have "intend[ed] to achieve a legitimate medical objective."

---

[12] For example, G. L. c. 94, § 200, as appearing in St. 1957, c. 660, provided, "A physician . . . in good faith and in the course of his [or her] professional practice only, for the alleviation of pain and suffering or for the treatment or alleviation of disease may prescribe . . . narcotic drugs." Similarly, G. L. c. 94, § 199E, as appearing in St. 1957, c. 660, exempted certain uses of narcotic drugs so long as they were "administered, dispensed and sold in good faith as a medicine, and not for the purpose of evading the provisions of the narcotic drugs law."

This approach is consistent with positions adopted by the Federal courts in interpreting the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §§ 801 et seq., on which the Commonwealth's Controlled Substances Act is modeled. See Brown, 456 Mass. at 716. Under the Federal statute, "courts have consistently concluded that it is proper to instruct juries that a doctor should not be held criminally liable if the doctor acted in good faith when treating his [or her] patients." United States v. Hurwitz, 459 F.3d 463, 477 (4th Cir. 2006). "[T]he government must prove . . . that the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice." United States v. Feingold, 454 F.3d 1001, 1008 (9th Cir.), cert. denied, 549 U.S. 1067 (2006).[13]

C. Standard for improper prescribing under G. L. c. 94C, § 19 (a). The distinguishing factor between proper and improper prescribing, or between mere malpractice and criminal conduct, is the practitioner's intent. The defining feature of a valid

---

[13] The emphasis on intentional action in United States v. Feingold, 454 F.3d 1001, 1007-1008 (9th Cir.), cert. denied, 549 U.S. 1067 (2006), perhaps reflects the Federal statute's explicit prohibition of "knowingly or intentionally" dispensing a controlled substance, 21 U.S.C. § 841(a)(1), language not included in G. L. c. 94C, § 19 (a). Because we interpret G. L. c. 94C, § 19 (a), to require the Commonwealth to prove that the accused practitioner acted without a legitimate medical objective, however, the requirement that the Commonwealth prove that the practitioner acted with intention is implied.

prescription is that it is issued for a legitimate medical purpose. This means that its issuance is the product of "an honest exercise of professional judgment as to a patient's medical needs . . . in accordance with what [the practitioner] reasonably believe[s] to be proper medical practice" (citation omitted). United States v. Volkman, 797 F.3d 377, 387-388 (6th Cir.), cert. denied, 136 S. Ct. 348 (2015).

Read together, "legitimate medical purpose" and "usual course of professional practice" capture what separates proper prescribing -- including erroneous prescribing that might constitute medical malpractice -- from improper prescribing. The two statutory phrases are not separate elements but, rather, mutually reinforcing concepts. If a prescription lacks a "legitimate medical purpose," it has been issued outside the "usual course of professional practice." See United States v. Nelson, 383 F.3d 1227, 1231 (10th Cir. 2004) (no distinction between "usual course of professional practice" and "legitimate medical purpose" in Comprehensive Drug Abuse Prevention and Control Act of 1970 and its implementing regulations).

Moreover, if a practitioner issues a prescription absent any effort to follow the basic routines associated with "the usual course of professional practice," this can indicate that a prescription was not intended for genuine medical treatment. See Comins, 371 Mass. at 232-233 (physician's failure to conduct

any medical examination prior to issuing prescriptions supported inference that physician acted without legitimate medical purpose).[14]

In sum, we hold that a practitioner may be found guilty of improper prescribing, in violation of G. L. c. 94C, § 19 (a), where the Commonwealth can establish that the practitioner issued a prescription for a controlled substance for a purpose other than genuine medical treatment. A prescription is not issued for genuine medical treatment where a practitioner fails to exercise medical judgment in a manner consistent with the basic routines associated with such medical treatment. Because mere malpractice does not constitute improper prescribing, a practitioner who errs despite a good faith effort to diagnose and treat a patient has not violated the statute.

ii. Probable cause to indict a practitioner for improper prescribing. We turn to whether there was sufficient evidence here to sustain the indictments for improper prescribing. As discussed supra, the Commonwealth must establish probable cause that (1) a practitioner (2) issued a prescription for a controlled substance (3) for a purpose other than genuine

---

[14] For example, in Comins, 371 Mass. at 229-230, 232-233, experts testified that the defendant's decisions to prescribe drugs requested by patients, or to prescribe drugs without ever examining the patient, were contrary to accepted medical practice and bolstered the conclusion that the defendant lacked a legitimate medical purpose in issuing those prescriptions.

medical treatment.  We first determine whether there was probable cause to indict Stirlacci.  As there was no dispute that Stirlacci is a practitioner, or that the twenty-six prescriptions at issue were for controlled substances, the only question is whether there was probable cause that the prescriptions were issued for a purpose other than genuine medical treatment.  We conclude that there was, and thus that there was sufficient evidence to indict.[15]

Viewing the evidence presented to the grand jury in the light most favorable to the Commonwealth, we consider what the grand jury could have found from the entirety of Stirlacci's transcripts, the patient records, and the State police trooper's testimony.[16]  From the evidence the Commonwealth put before them,

---

[15] We nonetheless note, as did the Superior Court judge, that the evidence presented to date, taken as true, indicates far less egregious conduct than that alleged in prior cases enforcing our narcotics laws against physicians.  Compare Commonwealth v. Pike, 430 Mass. 317, 321 (1999) (defendant stated that he was "local drug pusher"); Comins, 371 Mass. at 229 (defendant prescribed drugs at patient's request despite patient's statement that patient suffered from substance abuse, and defendant issued prescriptions without ever conducting medical examination of patient).

[16] The judge sought guidance from the Board of Registration in Medicine's prescribing practices policy and guidelines, which enumerate indicators that a prescription may lack a legitimate medical purpose.  Because the grand jury were not presented with these indicators, however, we decline to consider them in our analysis of whether the grand jury could have found probable cause on the evidence before them.

the grand jury reasonably could have inferred that Stirlacci, while incarcerated, authorized Miller to issue renewal prescriptions for existing patients, using pre-signed prescription forms. The grand jury arguably also could have inferred that one motive for doing so was to maintain cash flow.[17] Most significantly, the grand jury reasonably could have inferred that Stirlacci did not know which specific patients received renewal prescriptions from Miller.[18]

From these inferences, even absent expert testimony, the grand jury could have found that Stirlacci issued prescriptions without exercising individualized medical judgment at the time when the renewals were issued. From this, the grand jury could have concluded that Stirlacci issued prescriptions without first ascertaining whether they remained appropriate courses of treatment. This was sufficient to establish probable cause that the prescriptions were not issued for a legitimate medical purpose in the usual course of professional practice. Such a conclusion is further bolstered by a plausible inference that

---

[17] Stirlacci told Miller to "get charges in because that brings cash flow." Stirlacci separately told the manager of his Springfield office to "just try to plug in as much as we can . . . the pipeline's got to flow."

[18] In one telephone call, Stirlacci said to Miller, "I don't know how many [prescriptions] you wrote today. I don't know how many [pre-signed prescription forms] you have left."

Stirlacci's reason for directing Miller to issue the prescriptions was, at least in part,[19] to maintain the viability of his practice.[20]

iii. Nonpractitioner liability for improper prescribing under G. L. c. 94C, § 19 (a). We next consider whether G. L. c. 94C, § 19 (a), applies to nonpractitioners. We conclude that it does not.

"The starting point of our analysis is the language of the statute, 'the principal source of insight into Legislative purpose.'" Simon v. State Examiners of Electricians, 395 Mass. 238, 242 (1985), quoting Commonwealth v. Lightfoot, 391 Mass. 718, 720 (1984). General Laws c. 94C, § 19 (a), imposes liability on "practitioners." Chapter 94C includes an extensive definition of "practitioner" that makes no reference to lay

---

[19] The telephone records also revealed Stirlacci's concerns about patient abandonment, and the possibility of liability should any patients suffer medical injury after not having been able to obtain their medicines. Many patients' records indicate multiple chronic diagnoses and nonopioid prescriptions to treat chronic conditions, such as high blood pressure.

[20] Of course, "having . . . a keen profit motive does not itself denude a physician of the intention to treat medically a patient's condition." Commonwealth v. Kobrin, 72 Mass. App. Ct. 589, 607 (2008). While a profit motive would not alone establish probable cause of improper prescribing, it can support such a finding when presented, as here, in conjunction with more direct evidence that a practitioner lacked a legitimate medical purpose.

persons employed by medical professionals.[21]  See G. L. c. 94C,
§ 1.  Accordingly, Miller cannot be prosecuted directly as a
practitioner for improper prescribing.

We then consider whether Miller, acting as Stirlacci's
agent, could be prosecuted as an accessory.  The Commonwealth
argues that Miller could be held liable if she provided aid to
Stirlacci with the shared intent to issue prescriptions in bad
faith.  We construe G. L. c. 94C, § 19 (a), to preclude
prosecution of nonpractitioners as accessories.  The statutory
language expressly places "responsibility for the proper
prescribing . . . of controlled substances . . . upon the
prescribing practitioner," and a "corresponding
responsibility . . . with the pharmacist who fills the

---

[21] General Laws c. 94C, § 1, defines a "practitioner" as

"(a) A physician, dentist, veterinarian, podiatrist,
scientific investigator, or other person registered to
distribute, dispense, conduct research with respect to, or
use in teaching or chemical analysis, a controlled
substance in the course of professional practice or
research in the commonwealth;

"(b) A pharmacy, hospital, or other institution registered
to distribute, dispense, conduct research with respect to
or to administer a controlled substance in the course of
professional practice or research in the commonwealth.

"(c) An optometrist authorized by [G. L. c. 112, §§ 66 and
66B,] and registered pursuant to [§ 7 (h)] to utilize and
prescribe therapeutic pharmaceutical agents in the course
of professional practice in the commonwealth."

prescription." See G. L. c. 94C, § 19 (a). "Clear and unambiguous language in a statute is conclusive as to legislative intent." Massachusetts Insurers Insolvency Fund v. Smith, 458 Mass. 561, 565 (2010). The statute clearly refers to practitioners, and we see no reason to expand its reach. But see United States v. Vamos, 797 F.2d 1146, 1153-1154 (2d Cir. 1986), cert. denied, 479 U.S. 1036 (1987) (affirming conviction of physician's nurse and office manager for aiding and abetting distribution of controlled substance, outside scope of medical practice, under Federal controlled substances act).[22]

Interpreting G. L. c. 94C, § 19 (a), as a provision aimed specifically at practitioners also is sensible because the critical inquiry is whether the prescriptions were issued in furtherance of genuine medical treatment. Because criminal liability under G. L. c. 94C, § 19 (a), turns on the exercise of medical judgment, the Legislature could not have intended to evaluate the intentions of lay persons who lack the authority to provide or authorize medical treatment. We must interpret the provision "so as to render the legislation effective, consonant with sound reason and common sense" (citation omitted). Commonwealth v. Morgan, 476 Mass. 768, 777 (2017). We thus

---

[22] In Vamos, 797 F.2d at 1153-1154, however, the court was not presented directly with the question whether nonpractitioners could be prosecuted; at issue was the proper standard of liability.

conclude that Miller cannot be prosecuted for improper prescribing under the Controlled Substances Act, and the indictments against her charging violations of G. L. c. 94C, § 19 (a), properly were dismissed.[23]

  c. <u>Uttering a false prescription, in violation of G. L.</u> <u>c. 94C, § 33 (b)</u>. General Laws c. 94C, § 33 (b), prohibits "utter[ing] a false prescription for a controlled substance," and "knowingly or intentionally acquir[ing] . . . possession of a controlled substance by means of forgery, fraud, deception or subterfuge." The Commonwealth argues that the prescriptions at issue were "false" because they conveyed to the pharmacist the false impression that a doctor had been present to issue them, and because Miller altered the pre-signed prescription forms by filling in the details of each prescription. We reach a different conclusion. In our view, a prescription is "false" when it lacks genuine authorization, such as when a person issues a prescription with fake credentials, or "borrows"

---

[23] This is not to say that nonpractitioners are altogether immune from liability under the Controlled Substances Act. General Laws c. 94C, § 19 (a), is but one component of the act's comprehensive framework for regulating controlled substances, focused specifically on preventing practitioners from abusing their prescribing authority to engage in illicit distribution of such drugs. For example, had Miller issued the same prescriptions in Stirlacci's name, but without his permission, she could have been prosecuted for uttering false prescriptions under G. L. c. 94C, § 33 (b).

another practitioner's genuine credentials without that practitioner's involvement or consent.

i. Definition of "uttering a false prescription." To determine whether the indictments charging this offense should have been dismissed, we first must decide what conduct "uttering a false prescription" circumscribes. More specifically, we must identify what makes a prescription "false."

We begin with the plain statutory language, "the principal source of insight into Legislative purpose" (citation omitted). See Simon, 395 Mass. at 242. Three words -- "prescription," "utter," and "person" -- have particular significance. Under the Controlled Substances Act, a "prescription" may be issued only by a registered practitioner who is authorized to prescribe controlled substances. See G. L. c. 94C, § 18 (a)-(b). While provisions of the Controlled Substances Act that regulate prescriptions generally refer to "practitioners,"[24] G. L. c. 94C, § 33 (b), notably refers to "persons." The act defines "person" broadly to include individuals, businesses, and other entities. See G. L. c. 94C, § 1. Although the definition of "person" does

---

[24] See, e.g., G. L. c. 94C, § 1 (defining oral and written prescriptions as orders to dispense medication by "practitioner"); G. L. c. 94C, § 17 (a)-(b) (no Schedule II controlled substance may be dispensed without prescription by "practitioner"); G. L. c. 94C, § 18 (a)-(b) (prescriptions for controlled substances may be issued only by registered, authorized "practitioner"); G. L. c. 94C, §§ 19-19D (regulating conditions in which practitioners issue prescriptions).

not exclude "practitioners," a key distinction between the two is that only practitioners may prescribe drugs. One conclusion we thus can draw from the Legislature's choice to punish "persons" who utter false prescriptions is that the Legislature's focus was on those who lack prescribing authority.

We likewise presume that the choice to punish "uttering" was intentional. See Simon, 395 Mass. at 243 (where word has technical meaning, court will adopt that meaning). "Uttering" is defined as "presenting a false or worthless instrument with the intent to harm or defraud." Black's Law Dictionary, supra at 1860. "The elements of the crime of uttering . . . are '(1) offering as genuine; (2) an instrument; (3) known to be forged; (4) with the intent to defraud'" (citation omitted). Commonwealth v. O'Connell, 438 Mass. 658, 664 n.9 (2003). "Uttering" involves the deliberate use of an instrument falsely to convey authorization or entitlement. In this vein, "uttering" has been applied to the presentation of forged checks. See id. at 663 (sufficient evidence to convict of uttering where defendant cashed forged checks because logical inference was that defendant intended to convince bank to release funds); Commonwealth v. Analetto, 326 Mass. 115, 118-119 (1950) (check forger may be presumed to intend that payer will act under false impression that check is genuine).

The analogy to a forged check helps illustrate the types of false statements that "uttering" proscribes. When one "utters" a forged check, one falsely conveys that the specified funds were released by a person with the authority to do so. Just as a check authorizes the release of funds on the authority of the account holder, a prescription authorizes the dispensation of drugs on the authority of a licensed prescriber. We therefore can infer that a person "utters a false prescription" by deliberately issuing a prescription that appears real, but which actually was not issued by the authorized practitioner named in the prescription.

We draw further support for this reading from previous versions of the statute. See Bellalta, 481 Mass. at 378. In 1917, the Legislature enacted criminal penalties for any person "who, not being an authorized physician, dentist or veterinarian . . . knowingly issues or utters a prescription or written order falsely made or altered" (emphasis added). See St. 1917, c. 275, § 6. Subsequent revisions of this provision no longer include an explicit description of "uttering" as an offense committed by persons not authorized to practice medicine. Nonetheless, the revised versions retained language that reflects an intent to punish persons who misrepresent

themselves as having the authority to issue prescriptions.[25]  We thus conclude that a "false prescription" is one that falsely purports to have been issued by an authorized practitioner.[26]

ii.  <u>Sufficiency of the evidence to sustain the indictments</u>.  Even when viewed in the light most favorable to the Commonwealth, there is no evidence that either defendant deliberately appropriated false prescribing authority.  It may be that, technically, Miller "altered" the prescriptions.  There is no evidence, however, that Miller believed that she was exceeding the bounds of Stirlacci's authority.  Stirlacci, of course, neither forged nor altered the prescriptions; the signature was his, and he directed Miller to fill in the rest.

It also is relevant that the prescriptions at issue were renewals of ongoing treatment, as opposed to entirely new prescriptions.  Because the prescriptions were renewals, Miller

---

[25] For example, G. L. c. 94, § 203 (4), (5), as appearing in St. 1957, c. 660, provided that "[n]o person shall make or utter any false or forged prescription," but separately provided that "no person shall, for the purpose of obtaining a narcotic drug, falsely assume the title of . . . a manufacturer, wholesaler, pharmacist, physician, dentist, veterinarian, or other authorized person."

[26] To be clear, we are not suggesting that a practitioner never could utter a false prescription.  For example, if a practitioner were to issue a prescription for a substance the practitioner was not formally authorized to prescribe, or to use credentials that were false, inactive, or assigned to another practitioner, the practitioner would be in violation of the statute.

simply had to rely on Stirlacci's prior prescription to complete the new prescription form. She did not engage in any "new" medical decision-making, thereby acting entirely within the scope of Stirlacci's genuine prescribing authority. Although not present, Stirlacci thus effectively dictated the substance of the prescription by virtue of his prior decision to authorize treatment. In sum, each prescription in the present case was presented as having been issued by Stirlacci, and was, in fact, issued by him. The prescriptions were not "false" because Stirlacci authorized their issuance on the basis of his genuine authority to prescribe the indicated drugs. We thus conclude that the indictments under G. L. c. 94C, § 33 (b), properly were dismissed.

d. Submitting false health care claims in violation of G. L. c. 175H, § 2. We next consider whether there was probable cause to indict the defendants for submitting false health claims under G. L. c. 175H, § 2. The Commonwealth contends that the records of twenty-two patients establish probable cause that the defendants knowingly made false statements by using billing codes that would indicate to insurance companies that Stirlacci had seen the patients. The judge agreed with respect to sixteen patients. We conclude that there was probable cause with respect to twenty of the twenty-two counts against each defendant.

General Laws c. 175H, § 2, makes it a crime "knowingly and willfully" to make a false statement or to misrepresent a material fact in an application for payment of a health care benefit. Because establishing probable cause requires sufficient evidence of all the elements of an offense, see Moran, 453 Mass. at 884, we first must consider whether there was probable cause that the defendants submitted false statements and, if so, whether they did so knowingly.

i. Probable cause that the defendants made false statements. "False," in this context, means "wholly or partially false, fictitious, untrue, or deceptive." See G. L. c. 175H, § 1. According to the Commonwealth, there was probable cause to find that the defendants made false statements by submitting claims to insurance providers using billing codes indicating that the patients had been seen by a doctor. We agree.

Providers use a standardized system of procedure codes to classify the services provided to a patient when billing that patient's insurer. See United States v. Singh, 390 F.3d 168, 177 (2d Cir. 2004). Federal cases enforcing similar false health care claim provisions have determined that the use of an improper procedure code can constitute a "false statement" where it results in a service provider seeking reimbursement at a greater rate than the provider otherwise would have. See id.

at 177, 187-189 (evidence of health care fraud where doctor told nurse to bill her services using procedure codes that required doctor's involvement); United States v. Larm, 824 F.2d 780, 782-783 (9th Cir. 1987), cert. denied, 484 U.S. 1078 (1988) (sufficient evidence of false statement where defendant used procedure code implying medical examination took place despite availability of code that more accurately captured minimal services actually provided).

Here, the grand jury were not provided with an explanation of medical billing procedures.  They instead had two primary sources of information to use in determining whether the defendants made false statements:  patient records showing a billing entry on a date when Stirlacci was in Kentucky, and the trooper's testimony regarding the significance of those documents.[27]  We therefore consider whether the grand jury reasonably could have interpreted the patient billing records, with the aid of the trooper's testimony, as false.

From the billing entries alone, the grand jury could have inferred that patients were billed for an office visit on a date when Stirlacci was in Kentucky, and that Stirlacci was listed as

---

[27] For certain patients, there also were documents from the patients' insurance providers that presumably corroborated the data in the billing statement.  In most cases, however, these documents lacked sufficiently explicit links to the billing entries, and the State police trooper did not provide any detailed explanation of how to interpret them.

the service provider.  Absent more, however, this information would not amount to a false statement, because the grand jury also knew from the telephone calls that the renewals were issued to patients who visited the office, and that Stirlacci was the patients' doctor.  The Commonwealth provided no additional explanation of medical billing procedures that would have allowed the grand jury to determine that the billing entries falsely implied that Stirlacci was present.

The grand jury, however, also could have relied on the trooper's assertion that the patients' billing records indicated that they had been seen by Stirlacci.  Although the judge correctly observed that the trooper did not consistently describe each patient's records as documenting a visit with Stirlacci, the trooper twice made more general statements that records for all the patients indicated that the patients had been billed for visits with Stirlacci.

Thus, we conclude that the grand jury could have credited the trooper's testimony that billing entries in the patient records for the relevant time period implied Stirlacci's presence.  Upon reviewing the patient documentation that indicated billing entries on dates when Stirlacci was in Kentucky, the grand jury thereby could have inferred that the defendants made false statements.  We note, however, that the evidence submitted to the grand jury did not include billing

records for two patients;[28] accordingly, there was insufficient evidence of a false statement for two of the twenty-two counts against each defendant.[29]

ii.  Probable cause that the defendants acted knowingly. The Commonwealth also was required to establish probable cause that the defendants made the allegedly false statements "knowingly and willfully."  See G. L. c. 175H, § 2.  "A defendant's intent is 'not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at trial'" (citation omitted).  Commonwealth v. Pike, 430 Mass. 317, 321 (1999).  Prior cases in this area indicate that we can discern the requisite intent from deliberate misconduct.

---

[28] The defendants' argument that the inability to differentiate between the defective indictments requires dismissal of all of the indictments, under Commonwealth v. Barbosa, 421 Mass. 547 (1995), is misplaced.  In that case, the grand jury returned a single indictment that could have applied to two different alleged instances of criminal conduct.  Id. at 550.  Here, the grand jury were presented with records for twenty-two patients and returned twenty-two indictments; there is thus no question as to which transactions the grand jury intended to indict.  The remaining question simply is which counts of the indictment match which patients, a determination that is largely an administrative matter.

[29] Exhibit no. 12 does not include any billing data. Exhibit no. 14 does not include any billing records; it does include what appears to be insurance documents indicating a payment, but the information is insufficient to link the payment to a specific patient.

In <u>Pike</u>, we affirmed a conviction of submitting false Medicaid claims where there was evidence that the defendant, who described himself as "the local drug pusher," <u>id</u>., "furnished prescriptions which he knew were illegal and would serve as the basis of claims for Medicaid payments."[30]  <u>Id</u>. at 322-323.  The deliberate violation of prescribing rules was sufficient to establish that the defendant acted "knowingly and willfully."

Federal cases concerning similar false health care claim provisions further demonstrate that the fact that a falsehood stems from a deliberate violation of established rules can support the inference that the false statement was made knowingly.  See <u>Singh</u>, 390 F.3d at 177 (sufficient evidence of knowingly false statement where defendant was aware that his chosen billing code required physician's involvement based on explicit language on billing form); <u>Larm</u>, 824 F.2d at 782-783 (sufficient evidence of knowingly false claim where defendant previously had been informed that he was using improper codes).

Here, there was evidence that both defendants were aware that the nurse practitioner had told Miller that she should not be billing when patients had not been seen by a medical

---

[30] The defendant in <u>Commonwealth</u> v. <u>Pike</u>, 430 Mass. 317, 322 (2008), was convicted under G. L. c. 118E, § 40, which makes it a crime "knowingly and willfully [to make] or [cause to be made] any false statement" in connection with claims submitted to the Massachusetts Medicaid program.

professional, and yet decided to continue submitting claims.[31]

In addition, Stirlacci's statement that the nurse practitioner

did not understand that self-employed doctors had to operate by

rules that were different from those for large medical practices

also could support an inference that Stirlacci was aware that

his and Miller's conduct was improper.[32]  Viewing the evidence in

the light most favorable to the Commonwealth, we conclude that

the grand jury reasonably could have inferred that the

---

[31] The defendants at one point discussed the nurse
practitioner's concerns:

> <u>Miller</u>:  "I'm billing and she's [criticizing] me for the
> way I'm billing. . . .  I'm trying to . . . bring us
> revenue."

> <u>Stirlacci</u>:  "Why is she [criticizing you for] billing?"

> <u>Miller</u>:  "Because I'm doing a 99213, and she's like, 'I
> didn't even touch the patient.  You can't do that. . . .'
> I'm like . . . [w]hy are you [criticizing me for a] med
> refill that I'm doing a 99213.  Let me do it.  I want to
> get money for these . . . patients."

> <u>Stirlacci</u>:  "All right . . . .  You know the standards to
> bill, okay?  And with patients coming in, yes.  So . . .
> just . . . do what you know is right . . . ."

[32] Discussing the nurse practitioner, Stirlacci said to
Miller:

> "I don't understand her . . . .  [W]hen you're in the real
> world and you're trying to see patients and you're self-
> employed . . . you make the rules according to what works
> for you and what works for the patient . . . .  I agree
> with some of her rules and regulations . . . , but other
> things . . . [are] not going to work because it's not good
> for business."

defendants were on notice that their billing practices falsely could imply services that were not rendered. Moreover, the grand jury could have inferred from Stirlacci and Miller's conversations that they were sufficiently familiar with medical billing practices to know which billing codes were appropriate.[33] Therefore, the evidence presented, if not abundant, was sufficient to establish probable cause that the defendants each acted knowingly in making false statements.[34]

In sum, the Commonwealth established probable cause that the defendants submitted false health care claims in violation of G. L. c. 175H, § 2, for twenty of the twenty-two counts against each defendant where the grand jury had documentation of a billing entry. Because the individual indictments do not refer to the patients by name, the Commonwealth shall, as the judge previously ordered, submit a bill of particulars to

---

[33] The grand jury had evidence that Stirlacci told Miller to "put in the 99212 . . . for the date that [patients] picked [the renewal prescriptions] up, because they didn't see the doctor, so it's down charged. So, it's a 92 or a 93. . . . Anything and everything you can get in, get in." Although the grand jury did not have this information, apparently there is a separate code, 99211, that is appropriate to use when practitioners do not see patients. See United States v. Singh, 390 F.3d 168, 177 (2d Cir. 2004).

[34] Miller contends that, as an employee following orders, she could not have acted knowingly. This, however, is contradicted by the evidence that Miller disregarded the nurse practitioner's concerns and expressed a determination to have claims reimbursed.

clarify which indictments require dismissal.  See Mass. R. Crim.
P. 13 (b), as appearing in 442 Mass. 1516 (2004) (court may
order prosecution to file bill of particulars on its own motion
during time allotted for pretrial proceedings, or at any such
time as judge may allow).

3.  <u>Conclusion</u>.  There was sufficient evidence to indict
Stirlacci for twenty-six counts of improper prescribing in
violation of G. L. c. 94C, § 19 (<u>a</u>), and those counts should not
have been dismissed.  All the counts against Miller under G. L.
c. 94C, § 19 (<u>a</u>), shall be dismissed with prejudice.  The counts
against both defendants for uttering false prescriptions under
G. L. c. 94C, § 33 (<u>b</u>), shall be dismissed without prejudice.
Finally, there was sufficient evidence to indict both defendants
for twenty counts each of submitting false health care claims
pursuant to G. L. c. 175H, § 2.  On remand, the Commonwealth
shall submit a bill of particulars so that a Superior Court
judge may determine which of the counts should be reinstated
against both defendants, and which two counts must be dismissed
without prejudice.  The matter is remanded to the Superior Court
for further proceedings consistent with this opinion.

<u>So ordered</u>.